# PUBLISHED

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 18-1827

LULA WILLIAMS; GLORIA TURNAGE; GEORGE HENGLE; DOWIN COFFY; FELIX GILLISON, JR., on behalf of themselves and all individuals similarly situated,

        Plaintiffs – Appellees,

        v.

BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, LLC,

        Defendants – Appellants,

    and

DANIEL GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK; SUSAN MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN; MATT MARTORELLO,

        Defendants.

------------------------------

NATIONAL CONGRESS OF AMERICAN INDIANS; NATIONAL INDIAN GAMING ASSOCIATION; NATIONAL CENTER FOR AMERICAN INDIAN ENTERPRISE DEVELOPMENT; CONFERENCE OF TRIBAL LENDING COMMISSIONERS; ONLINE LENDERS ALLIANCE,

        Amici Supporting Appellant.

DISTRICT OF COLUMBIA; STATE OF CONNECTICUT; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE; STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH

CAROLINA; STATE OF PENNSYLVANIA; STATE OF VERMONT; STATE OF VIRGINIA; CENTER FOR RESPONSIBLE LENDING,

Amici Supporting Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:17–cv–00461–REP–RCY)

Argued: May 7, 2019                                    Decided: July 3, 2019

Before GREGORY, Chief Judge, AGEE, and DIAZ, Circuit Judges.

Reversed and remanded with instructions by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Agee and Judge Diaz joined.

**ARGUED:** William H. Hurd, TROUTMAN SANDERS, LLP, Richmond, Virginia, for Appellants. Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellees. **ON BRIEF:** David N. Anthony, Timothy J. St. George, TROUTMAN SANDERS, LLP, Richmond, Virginia; Justin A. Gray, ROSETTE, LLP, Mattawan, Michigan, for Appellants. Kristi C. Kelly, Andrew Guzzo, Casey S. Nash, KELLY & CRANDALL, PLC, Fairfax, Virginia; Alexandria Twinem, GUPTA WESSLER PLLC, Washington, D.C., for Appellees. Pilar M. Thomas, LEWIS ROCA ROTHGERBER CHRISTIE LLP, Tucson, Arizona; Derrick Beetso, NATIONAL CONGRESS OF AMERICAN INDIANS, Washington, D.C., for Amici National Congress of American Indians, National Indian Gaming Association, and National Center for American Indian Enterprise Development. Sarah J. Auchterlonie, BROWNSTEIN HYATT FARBER SCHRECK LLP, Denver, Colorado; Brendan Johnson, Sioux Falls, South Dakota, Luke A. Hasskamp, ROBINS KAPLAN LLP, Minneapolis, Minnesota, for Amicus Conference of Tribal Lending Commissioners. Brian Foster, Michael Nonaka, Luis Urbina, COVINGTON & BURLING LLP, Washington, D.C., for Amicus Online Lenders Alliance. William Corbett, Diane M. Standaert, CENTER FOR RESPONSIBLE LENDING, Durham, North Carolina, for Amicus Center for Responsible Lending. Karl A. Racine, Attorney General, Loren L. AliKhan, Solicitor General, Caroline S. Van Zile, Deputy Solicitor General, Richard S. Love, Senior Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C.; George Jepsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF CONNECTICUT, Hartford, Connecticut; Lisa Madigan, Attorney General, OFFICE OF THE ATTORNEY

GENERAL FOR THE STATE OF ILLINOIS, Chicago, Illinois; Janet T. Mills, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MAINE, Augusta, Maine; Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF MASSACHUSETTS, Boston, Massachusetts; Gurbir S. Grewal, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NEW JERSEY, Trenton, New Jersey; Joshua H. Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NORTH CAROLINA, Raleigh, North Carolina; Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF VERMONT, Montpelier, Vermont; Russell A. Suzuki, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF HAWAII, Honolulu, Hawaii; Tom Miller, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF IOWA, Des Moines, Iowa; Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MARYLAND, Baltimore, Maryland; Lori Swanson, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MINNESOTA, St. Paul, Minnesota; Barbara D. Underwood, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NEW YORK, New York, New York; Josh Shapiro, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF PENNSYLVANIA, Harrisburg, Pennsylvania; Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF VIRGINIA, Richmond, Virginia, for Amici District of Columbia, State of Connecticut, State of Hawaii, State of Illinois, State of Iowa, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Minnesota, State of New Jersey, State of New York, State of North Carolina, Commonwealth of Pennsylvania, State of Vermont, and Commonwealth of Virginia.

---

GREGORY, Chief Judge:

The Lac Vieux Desert Band of the Lake Superior Chippewa Indians ("the Tribe") formed two business entities under tribal law. This appeal arises from a suit brought by five Virginia residents against those entities, Big Picture Loans, LLC and Ascension Technologies, LLC (collectively "the Entities"). In the underlying action, the Virginia residents claimed that they obtained payday loans on the internet from Big Picture and that those loans carried unlawfully high interest rates. The Entities moved to dismiss the case for lack of subject matter jurisdiction on the basis that they are entitled to sovereign immunity as arms of the Tribe. After concluding that the Entities bore the burden of proof in the arm-of-the-tribe analysis, the district court found that the Entities failed to prove that they are entitled to tribal sovereign immunity.

The Entities now appeal that decision. Although the district court properly placed the burden of proof on the Entities claiming tribal sovereign immunity, we hold that the district court erred in its determination that the Entities are not arms of the Tribe. We therefore reverse the district court's decision and remand the case with instructions to dismiss the complaint.

I.

The Tribe entered the business of online lending in 2011 when it organized Red Rock Lending as a tribally owned LLC. Two members of the Tribe managed Red Rock, and the Tribe was its sole member. Red Rock provided loans to consumers from its offices on the Reservation and was subject to the Tribe's Tribal Financial Services

4

Regulatory Code, which is enforced by the Tribal Financial Services Regulatory Authority. Red Rock contracted with Bellicose, a non-tribal LLC, to provide vendor management services, compliance management assistance, marketing material development, and risk modeling and data analytics development. Matt Martorello, a non-tribe member, was its founder and chief executive officer.[1]

Two years after the formation of Red Rock, in February 2013, the New York Department of Financial Services sent cease and desist letters to several lending entities, including Red Rock, accusing them of "using the Internet to offer and originate illegal payday loans to New York consumers, in violation of New York's civil and criminal usury laws." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013). The Tribe and entities sought a preliminary injunction based in part on a claim that New York's regulation would infringe on tribal sovereignty. The district court denied the request, however, finding that the entities had not shown a likelihood of success on the merits because their online lending to New York customers constituted off-reservation activity and could thus be properly regulated under New York's anti-usury law. *See id.* at 360–61. The Second Circuit affirmed this decision in October 2014. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).

Around the same time, the Tribe formed three entities central to this appeal. On August 26, 2014, months before the Second Circuit's decision in *Otoe-Missouria*, the

[1] Bellicose assigned its interest in the contract to SourcePoint, a Bellicose subsidiary, in 2012. J.A. 158.

5

Tribe organized Big Picture as an independent tribal lending entity that would ultimately consolidate the activities of its other lending entities, including Red Rock. On February 5, 2015, the Tribe Council formed another entity, Tribal Economic Development Holdings, LLC ("TED"), to operate the Tribe's current and future lending companies. Also on February 5, 2015, the Tribe formed Ascension as a subsidiary of TED for the purpose of engaging in marketing, technological, and vendor services to support the Tribe's lending entities. The Tribe was the sole member of TED, and TED became Big Picture's and Ascension's sole member.

Also in early 2015, Martorello and the Tribe agreed on a basic framework for the sale of Bellicose: a seller-financed transaction with non-fixed payments over a seven-year term, with any outstanding amount due to be forgiven at the end of that term. Prior to that time, the Tribe and Martorello had engaged in multiple conversations about the potential sale of Martorello's consulting companies to the Tribe, which would allow the Tribe to engage in online lending without relying on outside vendors for support services. The seller-financier would be Eventide Credit Acquisitions, LLC, a company managed and majority-owned by multiple entities of which Martorello was the president. In short, Eventide would provide a $300 million loan to TED, which TED would then use to purchase Bellicose.

After continuing negotiations, the parties reached a final agreement in September 2015, memorializing the terms of the deal in a loan agreement and a promissory note. Under those terms, Big Picture would first make a distribution to TED of its gross revenues. TED would then distribute 2% of those revenues to the Tribe and reinvest an

6

additional 2% of gross revenues in growing Big Picture's loan portfolio. The parties agreed to increase the monthly distribution to the tribe from 2% to 3% in September 2016, and the agreement also provided that the percentage distribution would increase to 6% when half the loan had been repaid. In January 2016, the Tribe completed its purchase of Bellicose and acquired all of Bellicose's data and software. By September 2017, TED had distributed approximately $20 million in loan payments to Eventide and nearly $5 million to the Tribe.

TED now oversees both Big Picture and Ascension, and all three entities have their headquarters on the Reservation. Big Picture currently employs 15 tribal members on the Reservation, and Ascension employs 31 individuals, most of whom work outside the Reservation. An Intratribal Servicing Agreement sets forth the relationship between Big Picture and Ascension, with Ascension handling certain day-to-day aspects of the loan operations for Big Picture. Michelle Hazen and James Williams, both Tribe Council members, co-manage all three companies. Hazen is also chief executive officer of Big Picture, but Ascension's president is a non-tribal member.

In June 2017, Plaintiffs Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. brought a putative class action against Big Picture and Ascension, as well as individual defendants who are not parties to this appeal. Plaintiffs sought declaratory and injunctive relief, alleging that Big Picture charges interest rates on its loans that are substantially–50 times–higher than would be allowed if Virginia law were applicable. Before the district court, the Entities appeared specially to claim that

7

they are entitled to tribal sovereign immunity, submitting documentation in support of their assertion that they are arms of the Tribe.

Following jurisdictional discovery, the district court rejected the Entities' invocation of arm-of-the-tribe immunity. In reaching its decision, the district court determined that the driving force behind the formation of Big Picture and Ascension was "to shelter outsiders from the consequences of their otherwise illegal actions." J.A. 222. The district court placed the burden of proof for the immunity issue on the Entities. The Entities timely appealed.

## II.

On appeal from a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), we review "the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014). A factual finding is clearly erroneous if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012).

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831)). The Supreme Court has recognized that tribal immunity may remain intact when a tribe elects to engage in commerce using tribally created entities, *i.e.*, arms of the tribe, but the Court has not articulated a framework for

8

determining whether a particular entity should be considered an arm of the tribe. *See*

*Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S.

701, 704, 705 n.1 (2003) (holding that a tribe and its wholly-owned gaming corporation,

an arm of the tribe, were not "persons" who could sue under 42 U.S.C. § 1983). This

Court has recognized the existence of arm-of-the-tribe immunity but has likewise never

applied the doctrine to determine whether an entity qualifies as an arm of a tribe. *See*

*United States v. Bly*, 510 F.3d 453, 465 (4th Cir. 2007) (acknowledging the Supreme

Court's ruling in *Inyo County*).

## III.

## A.

As an initial matter, the parties dispute the proper allocation of the burden of proof

in the arm-of-the-tribe analysis. The district court held that Big Picture and Ascension, as

the parties claiming arm-of-the-tribe immunity, bore the burden of proving their

entitlement to immunity. Big Picture and Ascension contend that this was in error,

arguing that the tribal documents establishing the Entities should create a presumption of

immunity to be rebutted by Plaintiffs. Plaintiffs argue, by contrast, that the district court

properly looked to arm-of-the-state doctrine in reaching its decision as to the burden of

proof. We agree with Plaintiffs on this point.

In determining the proper burden allocation in this context, this Court's arm-of-

the-state doctrine guides our analysis. Given the unique attributes of sovereign

immunity, we have held that the burden of proof falls to an entity seeking immunity as an

9

arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction. *Hutto v. S.C. Retirement Sys.*, 773 F.3d 536, 543 (4th Cir. 2014). The same burden allocation applies to an entity seeking immunity as an arm of the tribe. Placing the burden of proof on the defendant entity aligns with our reasoning in *Hutto* that sovereign immunity is "akin to an affirmative defense" and gives proper recognition to the similarities between state sovereign immunity and tribal sovereign immunity. *Id.* Moreover, such an allocation recognizes that an entity that is formally distinct from the tribe should only be immune from suit to the extent that it is an arm of the tribe. Unlike the tribe itself, an entity should not be given a presumption of immunity until it has demonstrated that it is in fact an extension of the tribe. Once a defendant has done so, the burden to prove that immunity has been abrogated or waived would then fall to the plaintiff. Finally, as a practical matter, it makes sense to place the burden on defendants like Ascension and Big Picture, as they will likely have the best access to the evidence needed to demonstrate immunity. For these reasons, the district court properly determined that Ascension and Big Picture must prove that they are entitled to tribal immunity as arms of the Tribe by a preponderance of the evidence.

B.

Turning to the arm-of-the-tribe immunity analysis, the district court applied the factors set forth in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010). Those non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure, ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial

10

relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' "connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." *Id.* at 1187. The Ninth Circuit has adopted the first five *Breakthrough* factors to analyze arm-of-the-tribe immunity and also considers the central purposes underlying the doctrine of tribal sovereign immunity. *See White v. Univ. of Cal.*, 765 F.3d 1010, 1026 (9th Cir. 2014). The parties did not and do not dispute that these factors should guide our analysis.

Like the Ninth Circuit, we adopt the first five *Breakthrough* factors to analyze arm-of-the-tribe sovereign immunity and allow the purpose of tribal immunity to inform our entire analysis. The sixth *Breakthrough* factor, whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five *Breakthrough* factors. Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis.

Here, we find no clear error in the district court's factual findings. Reviewing the district court's legal conclusions de novo, however, we hold that the Entities are entitled to sovereign immunity as arms of the Tribe and therefore reverse the district court's decision.

### 1. *Method of Creation*

In considering the "method of creation of the economic entities," we focus on the law under which the entities were formed. *Breakthrough*, 629 F.3d at 1191–92. Formation under tribal law weighs in favor of immunity. *Id.* at 1191; *see also White*, 765

11

F.3d at 1025.  Here, as the district court found, Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's Constitution, and the Entities operated pursuant to the Tribe's Business Ordinance.  It is therefore undisputed that Big Picture and Ascension were "created under tribal law," which "weighs in favor of the conclusion that these entities are entitled to tribal sovereign immunity."  *Breakthrough*, 629 F.3d at 1191.  Accordingly, this factor weighs in favor of tribal sovereign immunity for both Entities.  *See Breakthrough*, 629 F.3d at 1191–92 (finding first factor weighed in favor of immunity where entities were created under tribal law).

## 2. *Purpose*

The second *Breakthrough* factor incorporates both the stated purpose for which the Entities were created as well as evidence related to that purpose.  629 F.3d at 1192–93.  The stated purpose need not be purely governmental to weigh in favor of immunity as long as it relates to broader goals of tribal self-governance.  For example, in *Breakthrough*, the Tenth Circuit found that this factor weighed in favor of immunity where the stated purpose of a casino was to financially benefit the tribe and enable it to engage in various governmental functions–even though the entities themselves engaged in commercial activities.  *Id.* at 1192; *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014) (holding that tribal immunity extends to "suits arising from a tribe's commercial activities, even when they take place off Indian lands").

Here, the district court accurately noted that the Tribe has stated a purpose for each Entity that relates to broader goals of tribal self-governance separate from the

12

Entity's commercial activities, *i.e.*, tribal economic development and self-sufficiency. Big Picture's stated purpose, included in its articles of organization, is to "engage in the business of operating one or more Tribal lending business(es)" as part of the Tribe's "strategic economic development efforts" aimed at "diversify[ing] the economy of the Tribe's Reservation in order to improve the Tribe's economic self-sufficiency." J.A. 365, 370. Similarly, Ascension's stated purpose, also included in its articles of organization, is to "engage in the business of operating one or more Tribal marketing, technology and vendor service business(es)," thereby fulfilling the same tribal economic development efforts. J.A. 380, 387. Thus, the stated purpose of the Entities supports the conclusion that this factor weighs in favor of immunity.

In holding otherwise, the district court reasoned: (1) the formation of the businesses was "for the real purpose of helping Martorello and Bellicose to avoid liability, rather than to help the Tribe start a business"; and (2) Big Picture and Ascension "do not fulfill their stated purposes in practice." J.A. 206–07. Neither rationale holds up.

The record indeed shows that the Tribe created Big Picture and Ascension following the Second Circuit's adverse ruling and the Consumer Financial Protection Bureau's enforcement action against another online lender, Western Sky, that claimed immunity based on its relationship with another tribe. *See* J.A. 1321–22 (Martorello emailing Tribal Council members and the Tribe's counsel regarding his concerns about the CFPB and New York enforcement actions); J.A. 1329 (emails after the enforcement actions between Martorello and the head of the Tribal Council scheduling a time to discuss "a potential bigger deal for [the Tribe] learning the Servicing business").

13

However, the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's design and urging. Indeed, the district court recognized that both Martorello *and* the Tribe "looked for ways to restructure Red Rock's lending operations to reduce exposure to liability." J.A. 201. The email communications among Martorello, the Tribe Council members, and the Tribe also indicate that the Tribe and Martorello were both interested in avoiding a potential CFPB enforcement action so that the lending operations could continue. As the district court found, the evidence "does not indicate that Martorello himself has received any substantial economic benefit from Big Picture." J.A. 212.

While Martorello certainly stood to benefit from the creation of Big Picture and Ascension and the continuation of the Tribe's lending operation, so too did the Tribe. Thus, the district court's conclusion that the "real purpose" of Big Picture and Ascension was simply to protect Martorello does not hold up (and is in fact contradicted by other findings in the district court's order). Unlike the tribe in *People ex rel. Owen v. Miami Nation Enters*, a California Supreme Court case relied upon heavily by the district court, the Tribe here did not create Big Picture and Ascension solely, or even primarily, to protect and enrich a non-tribe member. *See* 386 P.3d 357, 378 (Cal. 2016). Rather, the Tribe created Big Picture and Ascension so that its lending operations could continue, along with the economic benefits associated with that continuation. The fact that the Tribe created Big Picture and Ascension in part to reduce exposure to liability does not necessarily invalidate or even undercut the Tribe's stated purpose, *i.e.*, tribal economic

14

development. Indeed, in order to reach its stated goal, the Tribe may have deemed it necessary to reduce its exposure to liability. The district court therefore erred in finding this factor weighed against tribal sovereign immunity on this basis.

The district court's reasoning as to the fulfillment of the Entities' stated purposes was also in error. The district court determined that Big Picture and Ascension do not fulfill their stated purposes, because: (1) the Tribe's explanation as to how revenue from Big Picture is used is too vague, and the revenue received by the Tribe is a sliver of Big Picture's total earnings; (2) Ascension does not employ Tribe members; and (3) Ascension and Big Picture's compensation structures indicate that the Entities primarily benefit individuals and entities outside of the Tribe.

As to the first conclusion, the district court found that the money generated by Big Picture constitutes more than 10% of the Tribe's general fund and may contribute more than 30% of the fund within the next few years. Despite this evidence that Big Picture's revenue constituted a significant percentage of the Tribe's general fund, the district court nevertheless deemed the information provided by the Tribe as to the specific uses of those funds to be too vague. Without pointing to any evidence casting doubt on Hazen's assertions, the district court hypothesized that Big Picture's revenue might not actually fund the "governmental essential services" identified by Tribe Council member Hazen. J.A. 208.

The district court's conclusion on this front was wrong for three reasons. First, one of the primary purposes underlying tribal immunity is the promotion of tribal self-governance, which counsels against courts demanding exacting information about the

15

minutiae of a tribe's budget. That these funds constitute a significant portion of the Tribe's general fund in and of itself suggests that Big Picture's revenue has contributed to the Entities' stated purpose of tribal economic development.

Second, even applying the district court's exacting standard, the record shows–and the district court recognized–the specific Tribal activities that Big Picture's revenue has funded. Indeed, the district court explicitly recognized that Big Picture's funds had been used, in whole or in part, to:

- meet requirements necessary to secure $14.1 million in financing for the Tribe's new health clinic;

- refinance casino debt;

- fund college scholarships and pay for educational costs for members such as student housing, books, school supplies and equipment;

- create home ownership opportunities for members through tribally purchased homes;

- subsidize tribal members' home purchases and rentals;

- provide a bridge loan to complete the new tribal health clinic that offers services to the regional community;

- fund new vehicles for the Tribe's Police Department;

- fund an Ojibwe language program and other cultural programs;

16

- provide foster care payments for eligible children, propane assistance, and assistance for family care outside of the community; cover burial and other funeral expenses for members' families;

- fund renovations and new office space for the Tribe's Social Services Department; fund youth activities;

- renovate a new space for the Tribe's Court and bring in telecom services for remote court proceedings;

- and fund tribal elder nutrition programs and tribal elder home care and transport services.  J.A. 179–80.

In deeming the Tribe's evidence "far too general," the district court appeared to require a breakdown of exactly what percentage of the Tribe's budget went to each of these activities and exactly what percentage of the funding for these activities constituted Big Picture revenue.  Such a requirement is at odds with policy considerations of tribal self-governance and economic development.

The district court also erred in determining that this factor weighed against tribal sovereign immunity on the basis that the Tribe did not receive enough of a benefit from Big Picture compared with Eventide.  The district court found that the promissory note between TED and Eventide limits the funds available to the Tribe to 5% of Big Picture's total monthly earnings–a 3% monthly distribution and a 2% reinvestment amount.  The district court also found that Big Picture has given the Tribe a little under $5 million (about $3 million in distributions and $2 million for reinvestment) and that TED has made loan repayments to Eventide of approximately $20 million.  On these facts, the

17

district court concluded that "the Tribe has only received about 20% of Big Picture's total revenue, still a relatively small percentage." J.A. 210. The district court further recognized that Big Picture will not owe Eventide anything after the note terminates in seven years. Nevertheless, based on these facts, the district court concluded that the "revenue distribution disparity" between Big Picture and Eventide was so great that it weighed against a finding of immunity. We disagree.

As an initial matter, the district court cited to no authority suggesting that a tribe must receive a certain percentage of revenue from a given entity for the entity to constitute an arm of the tribe. Indeed, the evidence suggests that the Tribe would not have been able to finance a loan operation on its own and thus entered a loan agreement with a non-tribal entity in order to obtain revenue both now and in the future. Indeed, when the loan was originally signed, the Tribe received a one-time reinvestment of $1.3 million. J.A. 1346. Currently, the Tribe receives 5% of Big Picture's gross revenue distribution, and this percentage will increase to 8% upon payment of half the loan.[2] Finally, after seven years, the remaining balance will be forgiven, with all net revenue to the Tribe. At that time, in only a few years, not only will all revenue belong to the Tribe, but it will own outright all of the components of the commercial lending enterprise.

Thus, the facts of this case are a far cry from the circumstances in *Miami Nation*, where the evidence indicated that the tribe received barely any revenue, and the entities could not identify the percentage of profits from the lending operations that flowed to the

---

[2] This total includes a distribution of 6% of Big Picture's gross revenues to the Tribe plus 2% for reinvestment into Big Picture. *See* J.A. 1607.

18

tribe or how those profits were used. 386 P.3d at 378. Even more importantly, policy considerations of tribal self-governance and self-determination counsel against second-guessing a financial decision of the Tribe where, as here, the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity.

In addition to its concerns about revenue sharing, the district court found the Entities' employment opportunities and compensation structures to be problematic. While the district court recognized that Big Picture's employees consist mainly of the Tribe's members, it noted that Ascension does not employ any Tribe members, instead relying on employees who previously worked at Bellicose. The district court reasoned that this "composition may have been justified when Ascension was formed in 2015 because the company needed individuals with certain technical knowledge for the required support services, and Bellicose's employees were the perfect candidates." J.A. 211. The district court found the current lack of tribal employees unacceptable, however, and faulted the Tribe for doing "little more than encourag[ing] tribal members to pursue educational opportunities that would allow them to work for Ascension and Big Picture in the future." J.A. 211. At the same time, the district court rejected Plaintiffs' argument that the Tribe should have started training programs for tribal members to work at the company, because there was no indication that the Tribe had the capacity or funds to do so. The district court nevertheless found that Ascension had failed to contribute to the Tribe's stated purposes for the Entities, because Ascension only supported Big Picture's

19

"minimal revenue generation" and did not provide hiring opportunities for tribal members.  J.A. 211.

While employment of tribe members may be an indication that an entity is contributing to a tribe's self-governance or economic development, it is not required for this factor to weigh in favor of immunity.  As the district court noted, there is no evidence that the Tribe had the capacity to train its members to take on skilled employment at Ascension, but the district court nonetheless faulted the Tribe for not doing more to increase tribal employment.  More importantly, Ascension's support of Big Picture's lending operations, which the evidence indicates is important to Big Picture's operations, is directly related to achievement of the Tribe's stated purposes.

As to the compensation structures at Ascension and Big Picture, the district court found it problematic that Tribe Council member Hazen has been paid more than other tribal members at Big Picture and that Ascension's employees are paid more than Big Picture's employees.  The district court determined that these differences "lead to the conclusion that Big Picture and Ascension primarily benefit individuals and entities outside the Tribe, or only one tribal leader, both of which are inconsistent with the goal of economic development."  J.A. 212.  The Entities accurately point out that Hazen is chief executive officer of Big Picture and that it should therefore not be surprising that she is paid more than other Tribe members at the company.  The district court also found that Big Picture's employees require less technical training than Ascension employees, which may naturally lead to a pay differential.  At any rate, the district court erroneously determined that these pay differences necessitate a conclusion that the Entities *primarily*

20

benefit individuals and entities outside the Tribe. Such a conclusion disregards the substantial revenue that the Tribe has received (and will continue to receive) in the form of payouts and reinvestments.

In sum, because Big Picture and Ascension serve the purposes of tribal economic development and self-governance, this factor weighs in favor of immunity for both Entities.

### 3. Control

The third *Breakthrough* factor examines the structure, ownership, and management of the entities, "including the amount of control the Tribe has over the entities." 629 F.3d at 1191. Relevant to this factor are the entities' formal governance structure, the extent to which the entities are owned by the tribe, and the day-to-day management of the entities. Here, the district court found that this factor weighed against a finding of immunity for both Entities. We conclude, however, that this factor weighs in favor of immunity for Big Picture and only slightly against a finding of immunity for Ascension.

Big Picture is an LLC managed by two Tribe Council members, Hazen and Williams, who were appointed by majority vote of the Tribe Council and must be removed in the same way. As co-managers, Hazen and Williams are granted broad authority to bind Big Picture individually and "to do and perform all actions as may be necessary or appropriate to carry out the business of Big Picture including but not limited to the power to enter into contracts for services, to manage vendor relationships, and to manage personnel issues and affairs of Big Picture." J.A. 458. Hazen and Williams are precluded only from selling Big Picture's assets or waiving its sovereign immunity. J.A.

21

450–51. The district court found that the Tribe has a substantial role in the operations of Big Picture, "as the entity employs a number of tribal members"–including Hazen as its chief executive officer–and "conducts all of its operations on the Reservation." J.A. 214. On these facts, the district court correctly recognized that this "general structure is to assure that Big Picture is answerable to the Tribe at every level, which supports immunity." J.A. 215. Despite this conclusion, the district court found that this factor ultimately weighed against immunity for Big Picture, because its structure was outweighed by Ascension's substantial role in Big Picture's operations. We disagree.

The district court's determination rested on two underlying conclusions: "(1) that the Tribe's formal oversight of Big Picture is meaningless given Ascension's dominant role in Big Picture's lending operations; and (2) that, assuming Ascension has such a role, that entity is not controlled by the Tribe." J.A. 216.

As to the first conclusion, while Ascension does manage many of the day-to-day activities associated with Big Picture's lending, an entity's decision to outsource management in and of itself does not weigh against tribal immunity, as the district court recognized. *See Miami Nation*, 336 P.3d at 373. The Intratribal Servicing Agreement, which lays out the relationship between the two Entities, indicates that Big Picture remains in control of its essential functions. Indeed, the Intratribal Servicing Agreement expressly forbids Ascension from engaging in origination activities, executing loan documentation, or approving the issuance of loans to consumers. The Agreement assigns Ascension the duties to give "pre-qualified leads" to Big Picture and to provide the "necessary credit-modeling data and risk assessment strategies" used by Big Picture to

22

decide whether to issue a loan. J.A. 419. But the Agreement also provides that the "criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion" of Big Picture and that Big Picture "shall execute all necessary loan documentation." J.A. 420. The district court discounted these facts and instead speculated that, given Ascension's responsibility to identify borrowers based on its credit-modeling system, "it does not appear that Big Picture has much discretion to exercise when it receives recommendations or documents from Ascension." J.A. 216–17. But the Agreement itself provides that Big Picture may always "within [its] sole and absolute discretion" change the criteria used to extend funds when and if it deems such a change appropriate. J.A. 420. In other words, the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean that it does not have the power to choose differently in the future.

The district court recognized that Hazen and Williams have been actively involved in discussing items like Big Picture's operating budget and employee handbook and have approved forms sent by employees concerning a variety of policies and procedures. J.A. 217. The district court also discounted this evidence, however, finding that Williams's testimony that he was not knowledgeable about certain Big Picture subsidiaries or customer service representatives demonstrated that the Tribe did not actually control Big Picture. J.A. 218. Given the evidence of the Tribe's broad power, through Hazen and Williams, over Big Picture's important business decisions and management and evidence that Hazen and Williams in fact exercised that power with frequency, the district court erred in concluding that Big Picture was not controlled by the Tribe simply because of

23

Hazen and Williams's outsourcing of certain day-to-day management tasks and their lack of knowledge of some aspects of the lending operation. Indeed, even assuming Hazen and Williams lack knowledge as to certain aspects of the operation and did outsource aspects of day-to-day management to a non-tribal entity, such an arrangement would not in itself weigh against immunity, given the other evidence of Tribal control. *See Miami Nation*, 336 P.3d at 373.

As to Ascension, we agree with the district court that the control question is closer. Like Big Picture, Ascension is owned by its sole member, TED, and Hazen and Williams serve as managers of the company with a Tribe Council vote required for their removal. J.A. 218. Unlike Big Picture, Ascension has a non-tribal president, Brian McFadden, and it conducts most of its business outside the Reservation with non-tribe members. J.A. 218. McFadden must obtain Hazen's or Williams's approval for "changes in operations, personnel, or distributions," and the evidence demonstrates that Ascension employees have submitted request and approval forms to Hazen and Williams for certain business decisions. J.A. 219. However, Hazen and Williams have delegated to McFadden the authority to approve Ascension's strategic direction, execute documents on the company's behalf, open and manage Ascension's bank accounts, and oversee all matters necessary for the daily management of Ascension. Additionally, the Loan Agreement prevents TED and Ascension from modifying the Intratribal Servicing Agreement or terminating or replacing any managers or officers of Ascension without Eventide's consent. Given Hazen and Williams's delegation of authority as to certain aspects of

24

Ascension, this evidence, on balance, tends to weigh slightly against a finding of immunity for Ascension.

In sum, this factor weighs in favor of immunity for Big Picture and slightly against a finding of immunity for Ascension.

### 4. Tribal Intent

The fourth *Breakthrough* factor assesses the tribe's intent to extend its immunity to the entities. In some cases, the tribal ordinances or articles of incorporation creating the entities will state whether the tribe intended the entities to share in the tribe's immunity. That was the case here. The Tribe unequivocally stated its intention to share its immunity in Big Picture and Ascension's formation documents. Before the district court, Plaintiffs conceded that this factor weighed in favor of Big Picture and Ascension but argued that the district court should accord it the least weight out of all the factors. The district court rejected this argument but nevertheless concluded that this factor weighed against a finding of immunity "because to do otherwise is to ignore the driving force for the Tribe's intent to share its immunity." J.A. 222. This conclusion was in error, because the district court improperly conflated the purpose and intent factors. This factor focuses solely on whether the Tribe intended to provide its immunity to the Entities. As Plaintiffs conceded, it did. This factor thus weighs in favor of immunity for both Entities.

### 5. Financial Relationship

The fifth *Breakthrough* factor considers the financial relationship between the tribe and the entities. 629 F.3d at 1194. As the district court recognized, whether a judgment against an entity would reach the tribe's assets is a relevant consideration. However,

25

direct tribal liability for an entity's actions "is neither a threshold requirement for immunity nor a predominant factor in the overall analysis." *Miami Nation*, 386 P.3d at 373. Instead, courts consider the extent to which a tribe "depends . . . on the [entity] for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities." *Breakthrough*, 629 F.3d at 1195. If a judgment against the entity would significantly impact the tribal treasury, this factor will weigh in favor of immunity even if the tribe's liability for an entity's actions is formally limited. *Id.*

Here, as the district court recognized, the Tribe would not be directly liable for a judgment against Big Picture or Ascension. This fact alone has little significance in the analysis. Rather, the relevant inquiry evaluates the extent to which the Tribe depends on these Entities for revenue to fund its governmental functions and other tribal development. The district court found that this factor weighed against immunity, because the actual effect on the Tribe of a reduction in Big Picture's revenue "appears to be insubstantial" and Big Picture's revenue "does not play as important a role in the Tribe's general fund as in other cases where this factor supported immunity." J.A. 225.

Neither the cases cited by the district court nor the record support the proposition that the Tribe does not significantly depend on Big Picture's revenue. Given that 10% of the Tribe's general fund comes from Big Picture, a judgment against Big Picture or Ascension could in fact significantly impact the tribal treasury, which is at the heart of this analysis, even if it is unclear what the exact repercussions of that impact might be on

26

tribal members and services.[3]  Where, as here, a judgment against the Entities could significantly impact the Tribe's treasury, this factor weighs in favor of immunity even though the Tribe's formal liability is limited.  *See Breakthrough*, 629 F.3d at 1195.

C.

In summary, we find that all of the factors weigh in favor of immunity for Big Picture and all but one of the factors weigh in favor of immunity for Ascension. Accordingly, both Entities are entitled to immunity as arms of the Tribe.

We reach this conclusion with due consideration of the underlying policies of tribal sovereign immunity, which include tribal self-governance and tribal economic development as well as protection of "the tribe's monies" and the "promotion of commercial dealings between Indians and non-Indians."  *Breakthrough*, 629 F.3d at 1187–88.  The evidence here shows that the Entities have increased the Tribe's general fund, expanded the Tribe's commercial dealings, and subsidized a host of services for the Tribe's members.  Accordingly, the Entities have promoted "the Tribe's self-determination through revenue generation and the funding of diversified economic development."  *Breakthrough*, 629 F.3d at 1195.  A finding of no immunity in this case, even if animated by the intent to protect the Tribe or consumers, would weaken the Tribe's ability to govern itself according to its own laws, become self-sufficient, and develop economic opportunities for its members.

---

[3] As the district court acknowledged, a judgment against Ascension could "drastically reduce Big Picture's revenue."  J.A. 226.  Thus, a judgment against either Entity could impact the Tribe's treasury.

27

Although Plaintiffs stress the injuries they allegedly face as a result of the Entities' commercial activities, an entity's entitlement to tribal immunity cannot and does not depend on a court's evaluation of the respectability of the business in which a tribe has chosen to engage. Accordingly, the potential merit of the borrowers' claims against Big Picture and Ascension–and the lack of a remedy for those alleged wrongs–does not sway the tribal immunity analysis. It is Congress–not the courts–that has the power to abrogate tribal immunity. *See Bay Mills*, 572 U.S. at 800 ("[I]t is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity.").

Because a proper weighing of the factors demonstrates by a preponderance of the evidence that the Entities are indeed arms of the Tribe, Big Picture and Ascension are entitled to tribal sovereign immunity.

## IV.

For the foregoing reasons, we reverse the district court's order and remand with instructions to grant the Entities' motion to dismiss for lack of subject matter jurisdiction.

*REVERSED AND REMANDED WITH INSTRUCTIONS*