**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-1908

_____


RASHONNA M. RANSOM, on behalf of herself and others
similarly situated

v.


GREATPLAINS FINANCE, LLC, doing business as Cash
Advance Now; JOHN DOES 1–10

GreatPlains Finance, LLC,
                                    Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:22-cv-01344)
District Judge: Hon. William J. Martini

_____

Argued: June 4, 2025

Before: HARDIMAN, BIBAS, and FISHER, *Circuit Judges*

(Filed: August 4, 2025)

Adam H. Charnes
KILPATRICK TOWNSEND & STOCKTON
2001 Ross Avenue
Suite 4400
Dallas, TX 75201

Mark H. Reeves
KILPATRICK TOWNSEND & STOCKTON
1450 Greene Street
Suite 230
Augusta, GA 30901

Rob R. Smith          **[ARGUED]**
KILPATRICK TOWNSEND & STOCKTON
1420 5th Avenue
Suite 3700
Seattle, WA 98101
    *Counsel for Appellant*

Stephen R. Ward
CONNER & WINTERS
15 E 5th Street
4100 First Place Tower
Tulsa, OK 74103
    *Counsel for Amicus Conference of Tribal Lending Commis-
    sioners Supporting Appellant*

Daniel Baczynski     **[ARGUED]**
BACZYNSKI LAW
921 Sommerset Drive
West Fargo, ND 58078

Mark H. Jensen
Yongmoon Kim
KIM LAW FIRM
411 Hackensack Avenue
Suite 701
Hackensack, NJ 07601
    *Counsel for Appellee*

––––––––––––––

OPINION OF THE COURT

––––––––––––––

BIBAS, *Circuit Judge*.

Governments turn money into power. In go taxes; out flow police, pensions, and preschools. To figure out whether something is part of the government, then, often the best place to look is whether it matches either half of government's signature formula: Does it fund the government, and is it controlled by the government?

This case presents a firm whose governmental status is puzzling—a consumer lender owned by an Indian tribe. Lenders are sometimes part of tribal governments. But even though this one is mostly controlled by the tribe, a judgment against it would not affect the tribe's revenue. That factor often matters more and speaks more clearly here. We thus hold that the lender is not part of the tribe's government and so lacks its sovereign immunity.

## I. THE TRIBE CREATED GREATPLAINS, WHICH LENT MONEY TO RANSOM

Like any government, Indian tribes need money to operate and care for their members. But many tribes cannot raise much money by taxing income or property; Indian reservations are often poor, and much of their land is owned by non-Indians, whom tribes usually cannot tax. Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 771–74 & nn.87, 91, 93 (2004). Many tribes thus turn to entrepreneurship to fund their governments, from "sell[ing] cigarettes and prescription drugs online" to running casinos and hotels. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 823 (Thomas, J., dissenting) (2014); *id.* at 785 (majority). These businesses look like any other, with one big difference: If they count as part of a tribe's government, they enjoy sovereign immunity. *Id.* at 788–90 (majority); *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754–55 (1998).

Hence this case. A tribally owned lender allegedly broke a slew of consumer-protection laws, an aggrieved borrower sued it, and whether her suit can proceed depends on whether the lender counts as part of the tribe's government.

### A. The tribe created GreatPlains

The Fort Belknap Indian Community is a federally recognized Indian tribe in rural Montana. Like many tribes, its tax base is bone dry, so it has tried to raise money by starting a string of businesses. Those businesses contribute three-quarters of the tribe's non-federal budget.

4

To manage them, the tribe created a corporation: the Island Mountain Development Group. Profits from the tribe's businesses flow to Island Mountain, which sends a fifth of the money directly to the tribe. The other four-fifths is either reinvested in the tribe's businesses or spent on projects for tribal members, like housing or direct cash payments.

One of the tribe's businesses is GreatPlains Finance, an online consumer lender. GreatPlains was created by the tribe as a limited-liability corporation under tribal law, is wholly owned by it through a subsidiary, and is managed by Island Mountain. It does not directly employ anyone; rather, it leases all its workers from Island Mountain. And its articles of organization purport to shield it with the tribe's sovereign immunity.

GreatPlains is one of at least eight online lenders started by the tribe. From rural Montana, their websites reach across the country, offering small loans at staggering interest rates. GreatPlains' website shows a sample loan of $500 with an annual interest rate of 700% plus fees for late payments. *Rates*, Cash Advance Now, https://perma.cc/XAD9-ZN8N. Rates this high are illegal in most states. *State Annual Percentage Rate (APR) Caps for $500, $2,000 and $10,000 Installment Loans*, Nat'l Consumer L. Ctr., https://perma.cc/KN7M-N93N. But if tribal sovereign immunity applies, the lenders are shielded from lawsuits. This setup is lucrative: The tribe's lending businesses pump out 90% of Island Mountain's total revenue.

### B. GreatPlains made a private-equity deal

What do you get when you combine high-interest lending with immunity from suit? An attractive investment. Unsurprisingly, in 2021, a non-tribal private-equity fund called Newport

5

Funding lent up to $10 million to GreatPlains. The agreement promised Newport handsome returns: 21% interest per year, plus more fees for any untapped part of the $10 million line of credit. And before returning any profits to Island Mountain (and thus the tribe), GreatPlains must pay Newport first.

GreatPlains also pledged its assets as collateral and gave Newport a security interest in them. If Island Mountain threatened GreatPlains' ability to pay back the loan or interfered with the business, that would trigger a default. At that point, Newport could step in to protect its interest in GreatPlains' assets. It could also strip the tribal servicer of its power to service GreatPlains' loans and transfer that role to a non-tribal firm in Indiana. And it could take control of GreatPlains' bank accounts, stopping any money from being transferred or withdrawn without Newport's consent.

GreatPlains eventually fell into default. In 2023, the tribe "discover[ed] unexplained debts and evidence of potentially serious internal financial improprieties" at Island Mountain, so it replaced Island Mountain's board. App. 212. That leadership change triggered a default, and Newport ordered GreatPlains' bankers to block any withdrawal or funds transfer from Great-Plains' accounts without Newport's written consent. Great-Plains objected but could not stop these measures.

## C. After borrowing from GreatPlains, Ransom sued it

On the other side of the country, New Jerseyan Rashonna Ransom faced an emergency and desperately needed cash. She found GreatPlains' website and took out two loans, one at 652% annual interest and the other at 542%. Though she borrowed only $750, she owed around $4,000 in interest. She sued

6

GreatPlains, on her own behalf and for a putative class, for breaking several New Jersey consumer-protection laws.

### D. GreatPlains & Newport restructured their agreement

GreatPlains moved to dismiss, claiming tribal sovereign immunity. The District Court disagreed. Based partly on Newport's post-default control of Great Plains, the court held that the lender was not an arm of the tribe.

Newport then waived the default, restoring the tribe's control over GreatPlains' assets. Waiver in hand, GreatPlains moved to reconsider. The District Court denied the motion, and GreatPlains now appeals.

Tribal sovereign immunity is a mixed question of law and fact. *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1148 (10th Cir. 2012). We review the District Court's factual findings for clear error and its legal conclusions on tribal sovereign immunity and its application of law to the facts de novo. *Id.*; *see In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011).

## II. WE HAVE APPELLATE JURISDICTION

As a rule, we have jurisdiction only over appeals from final orders. 28 U.S.C. § 1291. But an exception allows interlocutory appeals of collateral orders—that is, orders that (1) conclusively decide (2) an important issue separate from the merits (3) that would be "effectively unreviewable" if we waited until after the final judgment. *Doe v. Coll. of N.J.*, 997 F.3d 489, 493 (3d Cir. 2021) (internal quotation marks omitted). Because sovereign immunity is a right to not even be dragged through litigation, denials of sovereign immunity are immediately

appealable as collateral orders. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143–45 (1993). GreatPlains claims that it was wrongly denied sovereign immunity. So we have jurisdiction to hear this appeal.

### III. WE CONSIDER ALL FACTS IN THE RECORD

In gauging subject-matter jurisdiction, courts typically look at the facts that existed when the plaintiff filed his complaint. *Nuveen Mun. Tr. v. WithumSmith Brown, P.C.*, 692 F.3d 283, 294 (3d Cir. 2012). Here, many relevant facts changed after Ransom sued: GreatPlains borrowed from Newport and defaulted, and Newport waived the default.

We can consider these changed facts. The time-of-filing rule has exceptions. *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 170–72 (3d Cir. 2023). And sovereign immunity is surely one of them. "[T]he general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 107 (1984). And post-filing changes can change that effect—for instance, if a tribe sells a business to a private party. Plus, a sovereign can consent to suit or withdraw its consent after a complaint is filed, thus creating jurisdiction that did not exist at the time of filing or destroying jurisdiction that did. *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529–30 (1857); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).

In short, sovereign immunity depends on whether a judgment would hit an unconsenting sovereign, and that can change right up until the judgment issues. "We therefore conclude that sovereign immunity is an ongoing inquiry rather than a

8

determination to be made … at the time of filing." *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1237 (10th Cir. 2010). So in deciding whether GreatPlains is an arm of the tribe, we consider all facts as they stand today.

## IV. WE REVIEW BOTH DECISIONS TOGETHER

GreatPlains appeals two decisions: the denial of its motion to dismiss and the later denial of its motion to reconsider. Normally, we would review each separately. *Lazaridis v. Wehmer*, 591 F.3d 666, 669–70 (3d Cir. 2010).

But here, we can consolidate our review. Start with the motion to dismiss. Reviewing de novo, we ask whether GreatPlains is an arm of the tribe given all the information before us, including Newport's waiver of default. *Reich v. Loc. 30, Int'l Bhd. of Teamsters*, 6 F.3d 978, 981–82 (3d Cir. 1993). On the motion to reconsider, we ask the same question and look at the same facts. And though we normally review such denials for abuse of discretion, "to the extent that the denial of reconsideration is predicated on an issue of law," like sovereign immunity, we review it de novo. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 673 (3d Cir. 1999). Because both appeals ask the same question, consider the same facts, and apply the same standard of review, we can consolidate them into a single question: Given all the facts in the record, is GreatPlains an arm of the tribe?

## V. GREATPLAINS IS NOT AN ARM OF THE TRIBE

It can be hard to tell where a tribe ends and a separate entity begins. To draw that line, we adopt the Tenth Circuit's test. On these facts, the most important factors are how much the tribe

9

controls the entity and especially whether a judgment would immediately cut tribal revenue. Under that test, GreatPlains is not an arm of the tribe.

**A. To discern an arm of a tribe, we consider five factors**

To judge whether an entity counts as an arm of a tribe, the Tenth Circuit created a multi-factor test. This test examines:

1) how the entity was created;

2) its purpose;

3) its ownership, management, structure, and how much the tribe controls it;

4) the tribe's intent to give it sovereign immunity;

5) its financial relationship with the tribe; and

6) whether giving it immunity would serve tribal sovereign immunity's purposes.

*Breakthrough Mgmt. Grp. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1181 (10th Cir. 2010). These factors are not exclusive. *Id.*

Today, we join our sister circuits in adopting that test. *See Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177 (4th Cir. 2019); *Mestek v. Lac Courte Oreilles Cmty. Health Ctr.*, 72 F.4th 255, 259 (7th Cir. 2023); *White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014). Still, some factors may matter more than others. In practice, factors (1), (2), and (4) may be easy to manipulate. Factors (3) and (5) may often matter more. And factor (5) speaks best to the reasons behind tribal sovereign immunity.

10

Most courts that follow *Breakthrough*'s test do not treat factor (6), about the purposes of tribal sovereign immunity, as its own factor. Instead, they weave it into their analysis of the other five. *E.g.*, *Williams*, 929 F.3d at 177. That leaves five factors, with the purposes informing each factor's importance. *Mestek*, 72 F.4th at 259.

What are those purposes? Other courts have said they include promoting tribal self-determination, cultural autonomy, and commercial relations between Indians and non-Indians. *See, e.g.*, *Breakthrough*, 629 F.3d at 1188. But we find it less useful to think up post hoc policy rationales and more helpful to focus on why courts recognized the immunity in the first place: to respect the tribe's governance and to protect its treasury. *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) (explaining that immunity respects tribes' "inherent sovereign authority"); *Breakthrough*, 629 F.3d at 1183 (noting that one rationale for immunity was to protect tribes' treasuries). Respecting the tribe's sovereignty corresponds to factor (3): A suit against an entity drags the sovereign into court only if the entity is under the sovereign's control. And protecting the tribe's treasury maps on to factor (5).

Between those two factors, the effect on the tribe's treasury may matter more. That factor is the core of sovereign immunity, shielding the fisc so governments can decide whether to spend finite funds on healthcare, education, pensions, or satisfying individual legal claims. Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L. Rev. 915, 937 (1988) ("[S]overeign immunity rests on the assumption that … the government should be able to weigh for itself whether submission to a traditional lawsuit would

11

harm or promote the public interest."); *Alden v. Maine*, 527 U.S. 706, 750 (1999) ("Private suits against nonconsenting [sovereigns] … may threaten [their] financial integrity …."). So in the analogous context of suits against government officers, courts decide whether a suit is really against the sovereign by looking at whether a judgment would hit the public coffers. *Dugan v. Rank*, 372 U.S. 609, 620 (1963); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). Sovereign immunity is really immunity for the sovereign's treasury, so how a judgment would affect tribal finances may merit the most weight.

In cases like this one, any tribal-immunity test regrettably must also serve another purpose: separating true arms of the tribe from shams. Unscrupulous lenders can seek out tribes to pose as figureheads, hide behind their sovereign immunity, and break state law scot-free. Unfortunately, these rent-a-tribe schemes do happen. Jayne Munger, Note, *Crossing State Lines: The Trojan Horse Invasion of Rent-a-Bank and Rent-a-Tribe Schemes in Modern Usury Laws*, 87 Geo. Wash. L. Rev. 468, 478–79 (2019). To reserve tribal sovereign immunity for tribal sovereigns, our test must sift out impostors.

That may mean putting less weight on factors (1), (2), and (4). Whenever a non-tribal business gets a tribe to pose as a figurehead, both (1) and (4) will be met: The parties may be sure to incorporate the business under tribal law and to note the tribe's intent to extend it sovereign immunity. As for factor (2), the entity's purpose, it may be easy to dash off a document reciting that the business's purpose is helping a tribe. *See People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 376, 378 (Cal. 2016) (even though firm's articles of incorporation listed purpose to help tribe, the "vast majority" of its revenue went to

12

non-tribal partners). True, the other half of factor (2), how much the business serves that stated purpose, may prove relevant. And it can be revealing if an entity flunks any of these factors. But because these factors may come out identically for true tribal arms and for shams, we do not find it very informative when these easily checked boxes are checked easily.

We thus apply the *Breakthrough* factors, emphasizing substance over form. At least on these facts, we pay particular attention to (3) and especially to (5). On each factor, GreatPlains bears the burden of showing that it favors immunity. *Bowers v. NCAA*, 475 F.3d 524, 546 n.25 (3d Cir. 2007).

### B. GreatPlains is not an arm of the tribe

1. *GreatPlains' method of incorporation favors its being an arm of the tribe*. Under this factor, an entity is more likely an arm of a tribe if it was (a) created under tribal law and (b) created by the tribe, rather than a preexisting entity absorbed by the tribe. *Miami Nation*, 386 P.3d at 372.

The District Court found that GreatPlains "was formed under tribal law and did not exist before the Tribe created it." App. 5. Those factual findings were not clearly erroneous. To be sure, Ransom concocts a theory that non-tribal firms created GreatPlains before the tribe absorbed it. But the record shows only that the tribe wanted to start a lender, had no experience doing so, and thus turned to outside partners for help. Five years later, Island Mountain ended GreatPlains' relationship with those partners and has run it ever since. That suggests that the tribe used outsiders to help it get a new business off the ground, not that outsiders had surreptitiously created the business on their

13

own. Although we give this factor little weight here, it favors immunity.

2. *GreatPlains' purpose slightly favors treating it as an arm of the tribe.* This factor asks whether the entity was created to benefit the tribe and to help it act as a government—for instance, by raising revenue. *Breakthrough*, 629 F.3d at 1192. It examines both the entity's stated purpose and how effectively it serves that purpose. *Miami Nation*, 386 P.3d at 372. Because the stated purpose is easy to manipulate, we put more stock in how much the entity serves it. Yet we cannot fixate on results—say, how much money the business earned the tribe or how many tribal jobs it created. That would make a business's tribal status turn on whether it happened to succeed. So to test this factor, we will focus on both (a) GreatPlains' stated purpose and (b) whether it was *designed* to serve that purpose.

As for stated purpose, the tribal resolution creating GreatPlains declares that it is meant to "further the economic well-being of the members of the [Fort Belknap Indian] Community." App. 117. That favors immunity, though we put little stock in it.

Is GreatPlains designed to achieve that purpose? On balance yes, though the evidence is mixed. The District Court found otherwise, in part because GreatPlains has no employees. But that is because it leases its workers from Island Mountain. By increasing demand for Island Mountain's workers, most of whom are tribal members, GreatPlains is designed to create tribal jobs.

On the other hand, the District Court also saw "no indication" that GreatPlains had ever returned any profit to the tribe,

14

after more than a decade in business and several changes in management. App. 6. That fact is hard to interpret. Island Mountain is entitled to all GreatPlains' profits, so the business seems designed to make money for the tribe. But it is not clear that it ever has, and that does not seem to be a commercial accident. Charging exorbitant interest rates should be a good line of business, and the tribe's other lenders have earned it fistfuls of money. GreatPlains insists that it just has not returned money to the tribe *yet*, because it reinvests all profits in the business. But it has never explained why the tribe's other lenders have earned the tribe so much money, yet GreatPlains is the mysterious outlier. When a business repeatedly fails to achieve its stated purpose for no clear reason, over more than a decade, that can be evidence that it might be serving a different, unstated purpose.

Still, those gnawing doubts cannot outweigh the solid evidence listed above. This factor favors immunity here, but less than it would otherwise.

3. *Control leans toward GreatPlains' being an arm of the tribe*. This factor asks who is really in charge. It examines the entity's governance, management, and ownership. *Williams*, 929 F.3d at 182. It also asks whether the entity's leaders come from the tribal government, are tribal members, or are at least tribal appointees. *Breakthrough*, 629 F.3d at 1193; *White*, 765 F.3d at 1025. At root, the question is: Who calls the shots?

The answer is mixed. On one hand, GreatPlains is wholly owned by the tribe and solely managed by Island Mountain, which in turn is wholly owned and run by the tribe. Island Mountain's board serves as the board of GreatPlains. All board

15

members are appointed and removable by the tribal council, and all board members are members of the tribal council. In turn, the board hires and can fire Island Mountain's CEO, who is a tribal member.

But the loan agreement limits the tribe's control. If the tribe threatens GreatPlains' ability to pay back the loan, taxes Great-Plains, or regulates it in a way that is adverse to Newport's interests, then GreatPlains falls into default. That limits the tribe's freedom to direct GreatPlains to pursue goals other than earning money to repay Newport—say, forgoing usurious interest rates because they are inconsistent with tribal values, or hiring more tribal workers at higher wages because the tribe wants to create jobs for its members. It also forces the tribe to treat GreatPlains as an independent entity beyond the tribe's full control.

Of course, we understand why a lender would insist on those terms. And a tribal business does not stop being tribal just because it borrows money and puts up collateral. But when that funding restricts the tribe's freedom of action, forcing it to put the lender's interests ahead of all else, the conclusion is inescapable: The tribe controls the business less.

"Less" is key. The *Breakthrough* factors are not binaries but matters of degree. *See Mestek*, 72 F.4th at 260. Here, the tribe still controls GreatPlains' day-to-day management and strategic direction, and this factor favors immunity. But its weight is reduced by GreatPlains' incomplete control.

4. *The tribe's intent favors immunity*. The fourth factor asks whether the tribe intended to confer its sovereign immunity on GreatPlains. *Breakthrough*, 629 F.3d at 1193–94. It did.

GreatPlains' articles of organization declare that it "is to enjoy the Tribe's sovereign immunity" and that "the Tribe hereby confers on [GreatPlains] sovereign immunity from suit to the same extent that the Tribe would have such sovereign immunity if it engaged directly in the activities undertaken by" Great-Plains. App. 99 ¶ 7. This factor favors immunity. Yet here, it is so easy to meet that we mostly discount it.

5. *The financial relationship between the tribe and Great-Plains weighs heavily against immunity.* The last factor asks how a judgment against the firm would affect the tribe's finances. It favors immunity if the tribe would be directly liable for a judgment. *Miami Nation*, 386 P.3d at 373. But it is enough if the judgment would cut into tribal revenue indirectly—say, by taking damages out of the profits the business would otherwise send the tribe. *Id.*

GreatPlains' finances do not affect the tribe's. It is a separate limited liability corporation, insulating the tribe from its liability. And the record nowhere suggests that it has ever returned a profit to Island Mountain. So if GreatPlains must pay a judgment, that likely will not reduce the tribe's immediate revenue by even a penny. GreatPlains responds that, instead of returning money to the tribe directly, it reinvests all its profits—if any are left after Newport gets paid—in the business. But unlike the tribe's other lending businesses, Great-Plains offers us no proof of its profitability at all. It has given us no ledgers, budgets, or projections showing that it retains any profit after paying interest to Newport, nor has it shown that it reinvests money in tribal businesses. It has not borne its burden of showing that an adverse judgment would harm the tribe. That cuts decisively against immunity.

17

* * * * *

GreatPlains' method of incorporation and the tribe's intent favor immunity, but that shows very little. The same goes for GreatPlains' stated purpose. And though GreatPlains seems mostly designed to achieve that purpose, the consistent lack of profitability means that this factor helps GreatPlains only marginally. That leaves the two most important factors: control and financial relationship. Control favors immunity, but only somewhat. By contrast, here GreatPlains' financial relationship with the tribe cuts decisively against immunity. And it is the more important factor.

*Breakthrough* is a five-factor test, not a one-factor test. But at least here, factor (5) is the most important. When the other factors are qualified and this one is resounding, it may sometimes tip the balance all on its own. That is true here: A judgment against GreatPlains will not immediately eat into tribal revenues, which GreatPlains' more modest showings on the other factors cannot overcome.

GreatPlains is not an arm of the tribe and so lacks the tribe's sovereign immunity. We will thus affirm and remand for further proceedings.