DA 22-0034

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 62

LUSTRE OIL COMPANY LLC, and
EREHWON OIL & GAS, LLC,

     Plaintiffs and Appellants,

   v.

ANADARKO MINERALS, INC. and
A&S MINERAL DEVELOPMENT CO., LLC,

     Defendants and Appellees.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
                In and For the County of Valley, Cause No. DV-2021-04
                Honorable Yvonne Laird, Presiding Judge

COUNSEL OF RECORD:

       For Appellants:

             James Parrot, William E. Sparks (argued), Beatty & Wozniak, P.C.,
             Denver, Colorado

             James A. Patten, Patten, Peterman, Bekkedahl & Green, PLLC,
             Billings, Montana

       For Appellees:

             Ryan C. Rusche, Matthew L. Murdock (argued), Sonosky, Chambers,
             Sachse, Endreson & Perry LLP, Washington, District of Columbia

                       Argued:  October 26, 2022
                  Submitted:  November 1, 2022
                   Decided:  April 6, 2023

Filed:

                       _____
                                Clerk

FILED

04/06/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0034

Justice Beth Baker delivered the Opinion of the Court.

¶1 Lustre Oil Company LLC and Erehwon Oil & Gas, LLC (collectively "Lustre Oil") appeal the Montana Seventeenth Judicial District Court's dismissal of their complaint for lack of subject-matter jurisdiction. After jurisdictional discovery, the District Court found A&S Mineral Development Company, LLC to be an arm of the Assiniboine and Sioux Tribes entitled to sovereign immunity. Lustre Oil argues in the alternative: (1) that the District Court "failed to utilize well-established law from the Tenth Circuit" when it found that A&S could be an arm of the Tribes despite its incorporation under Delaware law; (2) that the District Court improperly applied the Ninth Circuit's balancing test to determine that A&S was an arm of the Tribes; and (3) that the District Court erred when it found that the Tribes did not waive A&S's sovereign immunity.

¶2 We decline to adopt a firm rule that would automatically bar an entity incorporated under state law from claiming tribal sovereign immunity, but we agree with Lustre Oil that the District Court did not properly weigh the relevant jurisdictional factors when it concluded that A&S was an arm of the Assiniboine and Sioux Tribes. We accordingly reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Between the 1950s and 1980s, the Fort Peck Indian Reservation, home to the Assiniboine and Sioux Tribes (collectively "the Tribes"), experienced an influx of private drilling and development of oil and gas wells. At the time, the private companies conducting these activities were largely unregulated, and their operations resulted in

2

disastrous environmental impacts to the Reservation and the compromised health of the residing Tribal communities. This abuse of Tribal resources led the Tribes to take control of any further oil and gas development within the Reservation.

¶4      On March 9, 2009, through their Tribal Executive Board, the Tribes authorized the formation of the A&S Mineral Development Company, LLC ("A&S"), incorporating it under the laws of Delaware. The Tribes formed A&S to develop oil and gas resources on the Tribes' behalf. One such endeavor by A&S was to act as a holding company for the Tribes' interest in the Fort Peck Energy Company, LLC. The Tribes partnered with Native American Resource Partners, LLC and Quantum Tribal Energy Capital, LLC to form Fort Peck Energy Company, LLC for the purpose of furthering the Reservation's oil and gas resources. After Fort Peck Energy Company, LLC dissolved in 2017, A&S remained dormant for three years.

¶5      Anadarko Minerals, Inc., a private company, operated oil and gas well leases on privately owned land within the exterior boundaries of the Reservation. In 2018, after spilling approximately 600 barrels of oil and 90,000 barrels of produced water within the Reservation, Anadarko assigned those oil and gas leases to the Tribes as part of a settlement agreement with the Tribes and the United States Environmental Protection Agency. The Tribal Executive Board revived A&S in 2020 to develop the leases the Tribes acquired from this settlement agreement. Additionally, as part of its revival, A&S assumed responsibility for restoration and environmental cleanup efforts at abandoned well sites within the Reservation, duties previously assigned to the Tribes' Mineral Department and the Tribes' Office of Environmental Protection.

3

¶6     In February 2021, Lustre Oil filed an action against A&S and Anadarko in District Court seeking to quiet title and to invalidate A&S's interests in forty-one of the fifty-seven oil and gas leases A&S operates within the Reservation. Lustre Oil alleged that it obtained valid interests to those leases from a third-party lease broker after Anadarko let the leases expire prior to transferring the lease interests to A&S.

¶7     A&S and Anadarko moved the District Court to dismiss Lustre Oil's action for lack of jurisdiction, failure to join necessary and indispensable parties, and failure to state a claim on which relief could be granted. A&S and Anadarko based their motions on A&S's sovereign immunity as an arm of the Tribes. The District Court weighed the five factors from *White v. University of California*, 765 F.3d 1010 (9th Cir. 2014), to reach its conclusion that A&S is an arm of the Tribes, entitling it to immunity. Because it concluded that it did not have jurisdiction over A&S, the District Court dismissed Lustre Oil's suit after determining that A&S was an indispensable party.

## STANDARD OF REVIEW

¶8     "We review de novo a district court's ruling on a motion to dismiss for lack of subject matter jurisdiction." *Crawford v. Couture*, 2016 MT 291, ¶ 5, 385 Mont. 350, 384 P.3d 1038 (citations omitted). When a district court considers a motion to dismiss for lack of subject-matter jurisdiction based on a claim of sovereign immunity, it must engage in "sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial." *Bradley v. Crow Tribe of Indians*, 2003 MT 82, ¶ 18, 315 Mont. 75, 67 P.3d 306 (internal quotations omitted). We review these conclusions for correctness. *Crawford*, ¶ 5.

4

**DISCUSSION**

¶9     As a threshold matter, Lustre Oil asks this Court to adopt a bright-line rule preventing tribal entities from enjoying sovereign immunity when those entities are incorporated under the laws of a state rather than under tribal law. Alternatively, Lustre Oil argues that the District Court erred in its balancing of the *White* factors because none of the factors favor A&S's immunity. Finally, Lustre Oil argues that the District Court erred because even if the *White* factors favor immunity, the Tribes waived this immunity for A&S.

¶10     *Issue One: Whether this Court should categorically bar entities that are incorporated under state law from enjoying tribal sovereign immunity.*

¶11     Lustre Oil urges this Court to follow the Tenth Circuit's decision in *Somerlott v. Cherokee Nation Distributors Inc.*, 686 F.3d 1144 (10th Cir. 2012), and categorically bar an entity from claiming tribal sovereign immunity if incorporated under state law.

¶12     In *Somerlott*, Tina Marie Somerlott appealed a federal district court decision dismissing her employment discrimination claims for lack of subject matter jurisdiction. 686 F.3d at 1146. Somerlott's employer was CND, LLC, a clinic within the Reynolds Army Community Hospital in Fort Sill, Oklahoma. *Somerlott*, 686 F.3d at 1146. Though CND was wholly owned by a corporation regulated by the Cherokee Nation, it was incorporated under the laws of Oklahoma. *Somerlott*, 686 F.3d at 1146-47. CND was incorporated under Oklahoma law because, at the time, the Nation "did not have laws permitting the formation of limited liability companies." *Somerlott*, 686 F.3d at 1147. CND claimed tribal sovereign immunity and the district court determined that CND was a

5

"subordinate economic entity" of the Nation, entitling it to enjoy the Nation's immunity. *Somerlott*, 686 F.3d at 1147. Somerlott appealed to the Tenth Circuit, arguing that CND's activities were not sufficiently connected to the Nation to warrant sovereign immunity. *Somerlott*, 686 F.3d at 1147.

¶13 Just ten days before the Tenth Circuit received Somerlott's opening brief, it decided *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010). In *Breakthrough*, the Tenth Circuit outlined factors it considered "helpful" to determining whether an entity could share in tribal sovereign immunity. 629 F.3d at 1187 (citations omitted). It did not define "the *precise* boundaries of the appropriate test to determine if a tribe's economic entity qualifies as a subordinate economic entity entitled to share in a tribe's immunity." *Breakthrough*, 629 F.3d at 1187 (emphasis in original). It also declined to find the financial relationship between the Tribe and the entity at issue dispositive to its conclusion on immunity. *Breakthrough*, 629 F.3d at 1187. CND relied almost entirely on the factors from *Breakthrough* to argue that it was entitled to sovereign immunity. *Somerlott*, 686 F.3d at 1148.

¶14 The Tenth Circuit did not apply the factors it had recently outlined in *Breakthrough* to *Somerlott*, concluding that "the subordinate economic entity test is inapplicable to entities which are legally distinct from their members and which voluntarily subject themselves to the authority of another sovereign which allows them to be sued." *Somerlott*, 686 F.3d at 1149-50. We compare the ruling in *Somerlott* to the root principles of tribal sovereign immunity to determine whether to adopt a similarly bright-line rule.

¶15 Among the core aspects of sovereignty that tribes possess is the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S. Ct. 1670, 1677 (1978). As a general rule, sovereign immunity is not limited to suits that specifically name a sovereign as a party; "an arm or instrumentality" of a sovereign "generally enjoys the same immunity as the sovereign itself." *Lewis v. Clarke*, 581 U.S. 155, 162, 137 S. Ct. 1285, 1291 (2017).

¶16 The Supreme Court has noted the weight and importance of tribal sovereign immunity, declaring it to be a "necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.,* 476 U.S. 877, 890, 106 S. Ct. 2305, 2313 (1986). In other contexts, the Court has suggested that courts should examine the relationship between entities and their sovereign parent when determining sovereign immunity. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429, 117 S. Ct. 900, 904 (1997).

¶17 Tribes often form, and rely on, entities to carry out key aspects of tribal self-governance. In *J.L. Ward Associates v. Great Plains Tribal Chairmen's Health Board*, a federal district court in South Dakota held that a tribal entity incorporated under South Dakota law was entitled to immunity. 842 F. Supp. 2d 1163, 1182 (D. S. D. 2012). The entity was formed by sixteen different tribes to provide "adequate health care to their constituents—a group that suffers disproportionately from certain diseases and has a lower life expectancy than other Americans[.]" *J.L. Ward Assocs.*, 842 F. Supp. 2d at 1177. The district court found that by "engaging in these activities, [the entity] promotes the preservation of tribal cultural autonomy and tribal self-determination, two of the federal

7

policies behind tribal sovereign immunity." *J.L. Ward Assocs.*, 842 F. Supp. 2d at 1177. If the district court had halted its analysis at whether the entity was incorporated under tribal or state law, an entity formed to "represent the health care interests of [tribal] members to the federal government and to participate in the establishment of health care programs unique to the tribes' needs" would be without immunity. *J.L. Ward Assocs.*, 842 F. Supp. 2d at 1177. Similarly, in *Manzano v. Southern Indian Health Council, Inc.*, a health entity formed by seven tribes for the purpose of providing "health care to American Indians" was entitled to immunity despite its incorporation "solely under state law." No. 20-cv-02130-BAS-BGS, 2021 U.S. Dist. LEXIS 126475 at **2, 18 (S.D. Cal. July 7, 2021). These cases demonstrate the importance of examining the circumstances of each case rather than utilizing a single-inquiry test to analyze tribal sovereign immunity. The courts examined the relationship between the Tribes and their sub-entities and how they work together to promote tribal self-governance, determining the relationships reflected an extension of sovereign immunity.

¶18    We would not be the first to reject this bright-line ruling from *Somerlott*. In *Rassi v. Federal Program Integrators, LLC*, a federal district court declined to follow *Somerlott* after noting that "the Tenth Circuit's discussion of sovereign immunity in *Somerlott* was dicta." 69 F. Supp. 3d 288, 291 (D. Me. 2014). "More importantly," it considered the line of cases on which *Somerlott* relied to be unpersuasive in light of *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 115 S. Ct. 961 (1995). *Rassi*, 69 F. Supp. 3d at 292. The Supreme Court in *Lebron* concluded that "where . . . the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself

8

permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government." *Rassi*, 69 F. Supp. 3d at 292 (citing *Lebron*, 513 U.S. at 399, 115 S. Ct. at 974). The *Rassi* court concluded that because a federally created entity could retain the government's immunity under these circumstances, tribes should enjoy similar leeway. *Rassi*, 69 F. Supp. 3d at 292.

¶19 We, too, agree that state incorporation alone does not abrogate an entity's immunity. Tribes enjoy immunity from suit "on matters integral to sovereignty and self-governance." *Manzano*, No. 20-cv-02130-BAS-BGS, 2021 U.S. Dist. LEXIS 126475 at **28-29. For example, in *EEOC v. Navajo Health Foundation*, the court concluded that incorporating as a nonprofit under Arizona law did not affect a hospital's status as an Indian tribe. No. CV-06-2125-PCT-DGC, 2007 U.S. Dist. LEXIS 66839, at *3 (D. Ariz. Sep. 6, 2007). In *Giedosh v. Little Wound School Board, Inc.*, a school board's status as an Indian tribe remained unaffected by its incorporation as a nonprofit under South Dakota law. 995 F. Supp. 1052, 1058 (D.S.D. 1997). Here, the Tribes formed A&S for both governmental and business-related purposes. If A&S were to be sued over its environmental clean-up work—a function integral to self-governance—it would have a strong claim to immunity. This is not to say that "business activities" are barred from tribal sovereign immunity. *See Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006) (immunity can "extend[] to business activities of the tribe, not merely to governmental activities."). But the nature of the entity's activity—not just whether the entity is incorporated under state or tribal law—should remain an important consideration

9

when determining whether to extend immunity.[1] To best support tribal self-governance and autonomy, a court considering a jurisdictional challenge should examine all the circumstances to determine whether an entity is an arm of a tribe that shares its sovereign immunity. The case law reveals considerable variability in outcomes because of the fact-dependent nature of the courts' analysis.

¶20 In sum, though we find no fault with the District Court's conclusion that A&S's incorporation under Delaware law does not favor immunity, the court did not err when it refused to deny A&S tribal sovereign immunity based on state incorporation alone.

¶21 *Issue Two: Whether the* White *factors weigh in favor of finding tribal sovereign immunity for A&S.*

¶22 "Tribal sovereign immunity not only protects tribes themselves, but also extends to arms of the tribe acting on behalf of the tribe." *White*, 765 F.3d at 1025 (citing *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790, 134 S. Ct. 2024, 2031 (2014) (other citations omitted). In *White*, the Ninth Circuit considered the following five factors derived from *Breakthrough* to determine whether an entity acts "on behalf of the tribe":

> (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities.

*White*, 765 F.3d at 1025 (quoting *Breakthrough.*, 629 F.3d at 1187). Like the *Breakthrough* court, we decline to adopt a precise test for determining whether a tribe's economic entity

---

[1] At oral argument, Lustre Oil's counsel acknowledged that immunity and waiver thereof may be determined on a claim-specific basis.

is entitled to share the tribe's sovereign immunity. But we agree that these factors provide useful guidance in a reviewing court's consideration. When assessing the factors, the analysis should be guided by the "central policies" supporting tribal sovereign immunity, including the "preservation of tribal cultural autonomy" and the "preservation of tribal self-determination." *White*, 765 F.3d at 1025. Here, the District Court assessed each *White* factor individually and concluded that A&S was entitled to sovereign immunity.

¶23 First, the District Court considered the "method of creation" for A&S. Following *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019), it focused on the incorporation of A&S under Delaware law. Though it did not consider this fact dispositive, the District Court determined that A&S's incorporation under Delaware law weighed against a finding of tribal sovereign immunity. The court stated that "[m]ost courts that have been confronted with this issue have held that organization under state law weighs against a finding that the entity in question has sovereign immunity."

¶24 Second, the District Court considered A&S's purpose and found that this factor weighed "heavily" in favor of sovereign immunity. It reasoned that purposes related to "broader goals of tribal self-governance" should weigh in favor of finding immunity. *Williams*, 929 F.3d at 178. The court considered documents related to the formation of A&S and concluded that the entity was "formed to provide revenue for tribal government programs by conducting oil and gas development on behalf of the Tribes' [sic]." The District Court found that "A&S's environmental purposes significantly advance the policy of tribal self-determination[;] because of this and the entity's role in funding the Tribes in lieu of a tax base this factor weighs heavily in favor of sovereign immunity."

11

¶25 The District Court also found that the third factor, management and control by the Tribes, weighed in favor of sovereign immunity. It considered A&S's formal governance structure; its ownership by the Tribes; its day-to-day management; the Tribes' authority to appoint and remove managers and board members; and, proportionally, how many employees were members of the Tribes. The District Court found that the Tribal Executive Board "retains ultimate authority over A&S." Additionally, the Tribal Executive Board appoints the officers and the manager of A&S and retains the right to override decisions and assume complete control over A&S at any time. The court found that three employees out of four are Tribal members, and all five of A&S's officers are Tribal members. The District Court also found that the manager of A&S, though not a Tribal member, is "a long serving and loyal tribal employee." Based on these facts, the court concluded that the Tribes exercised sufficient management and control to favor sovereign immunity.

¶26 The District Court found that the fourth factor, the Tribes' intent to share its immunity, did not weigh in favor of A&S based on the A&S Operating Agreement and the Fort Peck Energy Company Operating Agreement. The court considered Section 10.9 of the A&S Operating Agreement that reads as follows: "Any agreement, obligations, and transactions entered into by [A&S], shall be solely for its account and only its assets shall be subject to any claim related thereto." Though the court did not consider this language an "express waiver" of sovereign immunity, it did determine that this language, along with language from the Fort Peck Energy Company Operating Agreement specifically stating that A&S "shall not be construed as possessing sovereign immunity," demonstrated that the Tribes "intended A&S to be subject to suit in state court."

12

¶27    Finally, the District Court assessed the Tribes' financial relationship with A&S and determined that this factor weighed in favor of sovereign immunity. The court found that "all of A&S's profits are distributed directly to the Tribes on a quarterly basis." Because the revenue from A&S goes "directly to the Tribes' general fund to be used for tribal government programs as provided by tribal law," the court found that this factor weighed in favor of tribal sovereign immunity.

¶28    The District Court then tallied the five factors, concluding that because "three out of the five factors weigh in favor of immunity," A&S should be considered an arm of the Tribes protected by sovereign immunity. The court placed particular emphasis on the purpose of A&S and the financial relationship between the Tribes and A&S as supportive in its finding for immunity. On appeal, both parties take issue with the District Court's assessment of certain *White* factors.

¶29    A&S and Anadarko first contend that "the circumstances of A&S's creation actually support its immunity" because it was created by the Tribes' elected legislature, the Tribal Executive Board, as authorized by the Tribes' Constitution. A&S and Anadarko submit that "A&S's formation is readily distinguishable from the chartering of a normal business entity because the Tribes created A&S to fulfill important objectives of governmental policy." Lustre Oil argues that incorporating under state law "weighs *heavily* against a finding of sovereign immunity."

¶30    We conclude that incorporating under state rather than tribal law does not favor immunity. *See American Prop. Mgmt. Corp. v. Superior Court*, 206 Cal. App. 4th 491, 502, 141 Cal. Rptr. 3d 802, 810 (2012) (citing cases from different jurisdictions that

13

weighed incorporation under state law against a finding of sovereign immunity). Courts and commentators have observed that a tribe effectively may communicate its intention to waive sovereign immunity for a tribal enterprise by creating a business entity under state law. *See Wright v. Colville Tribal Enterprise Corp.*, 159 Wn. 2d 108, 113-115, 147 P.3d 1275, 1279-80 (Wa. 2006) (noting that "[w]hen a tribal corporation and government are not completely distinct, the immunity of the latter extends to the business operations of the former," but suggesting that incorporation under state law has the opposite effect) (citing Dao Lee Bernardi-Boyle, *State Corporations for Indian Reservations*, 26 Am. Indian L. Rev. 41 (2001)). *See also Airvator v. Turtle Mountain Mfg. Co.*, 329 N.W.2d 596, 602-03 (N.D. 1983) concluding that "state-chartered corporations should be treated as non-Indians" because, in part, "a corporation is an entity distinct and separate from its shareholders, directors, officers, and agents," which may sue and be sued under state law).

¶31 Some of these courts appear to follow the *Somerlott* approach. *See e.g., State v. Cherokee Servs. Grp., LLC*, 2021 ND 36, ¶ 15, 955 N.W.2d 67 (N.D. 2021) (recognizing North Dakota's rulings that "[w]hen a tribal entity subjects itself to a state by organizing under the state's laws, it waives sovereign immunity."). But we decline to adopt Lustre Oil's position that incorporation under state law should hold such a heavy emphasis without also considering the entire circumstances of an entity's method and creation as related to its parent tribe. In *Manzano*, the court looked beyond the entity's incorporation solely under state law to find that the entity's method and creation did favor immunity because the entity provided health services to tribal communities on tribal land and comprised "federally recognized tribes, all of which passed resolutions authorizing it to assume

14

authority from the government over its services." No. 20-cv-02130-BAS-BGS, 2021 U.S. Dist. LEXIS 126475 at **16-18; *see also McCoy v. Salish Kootenai College, Inc.*, 334 F. Supp. 3d 1116, 1121 (D. Mont. 2018), *aff'd,* 785 Fed. Appx. 414 (9th Cir. 2019) (holding that "state incorporation or dual incorporation does not divest a tribal corporation of its tribal status" and considering the *White* factors to conclude that tribal college was an arm of the tribe entitled to share in its sovereign immunity).

¶32 Lustre Oil argues in turn that the purpose of A&S simply was to shield the Tribes from legal and financial liability. Some courts have adopted the understanding that a tribal entity's "stated purpose is sufficiently related to tribal self-governance where the 'entity was created to develop the tribe's economy, fund its governmental services, or promote cultural autonomy.'" *Applied Scis. Info. Sys. v. Ddc Constr. Servs.*, No. 2:19-cv-575, 2020 U.S. Dist. LEXIS 94435 at *7 (E.D. Va. Mar. 30, 2020) (citing *People v. Miami Nation Enterprises*, 2 Cal. 5th 222, 246, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016)). It is clear from A&S's formative documents that it was created to develop the Reservation's oil and gas resources as well as to assume responsibility for environmental cleanup efforts related to oil and gas development. These are goals that fund the Tribes' governmental services by developing oil and gas resources and promote the cultural autonomy and self-governance of the Tribes by protecting Tribal lands from environmental degradation. *See Breakthrough*, 629 F.3d at 1188 (citations omitted).

¶33 Though Lustre Oil does not dispute that the Tribes own A&S or that the Tribal Executive Board retains control over A&S, it argues that the management and control of A&S weighs against a finding of immunity because the Tribes "delegated most of the

15

control of A&S to its General Manager, Ms. Debi Madison, who is not a member of the Tribes." In *Miami Nation Enterprises*, the California Supreme Court concluded that tribes may "be enmeshed in the direction and control of the business without being involved in the actual management." 2 Cal. 5th at 247, 386 P.3d at 373 (quotation omitted). Based on the Tribes' oversight of A&S and the Tribal Executive Board's right to assume control of A&S at any time, together with the right to appoint officers and the manager, we conclude that its appointment of Debi Madison, a non-Tribal member but long-time Tribal employee, as manager is not enough to weigh A&S's management against a finding of immunity.

¶34    Lustre Oil also contends that the financial relationship between A&S and the Tribes does not support immunity because there is no proof of the proportionate share of A&S's financial contributions to the Tribes' overall budget. Lustre Oil complains that the Tribes were wrong to withhold information regarding their overall budget from the District Court record. We agree with the Connecticut Supreme Court, however, that courts need not probe so deeply into a tribe's governmental affairs. The "opening and examination of a tribe's financial books and records . . . in the absence of any indication that . . . proceeds are flowing to nontribal members or that the entities serve a purpose other than the one asserted by the tribe, would infringe too greatly on tribal self-governance and self-determination." *Great Plains Lending, LLC v. Dep't of Banking*, 339 Conn. 112, 135, 259 A.3d 1128, 1144-45 (citing *Williams*, 929 F.3d at 180). A&S returns one hundred percent of its profits to the Tribes, which amounted to nearly $185,000 over a three- to four-month period the District Court examined. We consider more important the percentage of profits returned to the Tribes than the proportionate share A&S contributes to the Tribes' overall budget.

16

Lustre Oil provided no indication that A&S falsified this information or that the Tribes did not use this revenue to fund their government.

¶35 A&S and Anadarko argue that the District Court incorrectly concluded that the Tribes did not intend to share their sovereign immunity with A&S. They argue that the "close association and control over A&S" should demonstrate that the Tribes intended to extend sovereign immunity. But the District Court's conclusion on this point finds support in the record. It reflects that whenever the Tribes had occasion to address the matter, they documented their intent to treat A&S as a separate entity not immune from suit in state courts.

¶36 First, the March 10, 2009 A&S Operating Agreement contains several provisions separating the Tribes, as a member, from A&S, as a company, for liability purposes. Section 1.6 of the Operating Agreement contains the following language:

> **Qualification in Other Jurisdictions.** The Company may do business in any jurisdiction only if such jurisdiction recognizes the *limited liability of the Member* to substantially the same extent as would be recognized for a limited liability company under the laws of the State of Delaware.

(Italics added.) Similarly, Section 6.2 limits the liability of the Tribes to third parties:

> **Liability to Third Parties**. No Member shall be liable for the debts, obligations, or liabilities of the Company, including under a judgment decree or order of a court. No agreement or commitment entered into by the Company shall bind or be enforceable against the Member or the Member's Assets. All such debts, obligations, liabilities, agreements, or commitments shall be solely obligations of the Company, *enforceable and collectable only against and from the Company's assets*.

(Italics added.) In Section 10.2, the Agreement distinguishes between its governing law and that governing the Tribes' conduct:

17

**Governing Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware without regard to principles of conflict of laws. . . . All matters pertaining to any action taken by the Tribes, as the Member of the Company, and the Tribes' Executive Board shall be governed and construed with the laws of the Tribes.

In Section 10.9, the Tribes clearly retain their sovereign immunity and again separate A&S from the Tribes for the purposes of liability. In the original agreement the following section was drafted in bold and all-capitalized letters:

**Sovereign Immunity of the Tribes.** Any agreements, obligations, and transactions entered into by the company shall be solely for its account and *only its assets shall be subject to any claim* related thereto. *In no event shall the Tribes have any obligation or be subject to any claim with respect to any agreement or transaction into which the company may enter or engage.* Nothing herein contained shall be construed as a waiver or limitation of the sovereign immunity possessed and enjoyed *by the Tribes* as federal recognized Indian Tribes or by their officers, the members of their executive board, their employees and agents.

(Italics added.) This founding document shows the Tribes' intent to establish a separate corporate entity "subject to . . . claims" while preserving the Tribes' sovereign immunity.

¶37 Next, the 2009 Fort Peck Energy Company Operating Agreement expressly provided that A&S "shall not be construed as possessing sovereign immunity" and that A&S "irrevocably waives any sovereign immunity that it may be construed to possess." The Agreement was followed by a separate Acknowledgment and Waiver of Sovereign Immunity, in which the Tribes expressly acknowledged that A&S "does not and shall not be construed to possess sovereign immunity." The Acknowledgment and Waiver expressed further that this waiver extended to "any sovereign immunity that [A&S] now or in the future may possess or may be construed to possess." The Tribes made clear in the same document that they did not waive their own sovereign immunity.

18

¶38    A&S points out that the Fort Peck Energy Company Operating Agreement was specific to the Fort Peck Energy Company and, by its terms, did "not creat[e] any rights or benefits in or to third parties,"—i.e., Lustre Oil.  The Acknowledgment and Waiver also made clear that it was adopted in order to induce the private partners to enter into the Fort Peck Energy Company venture.  We agree with A&S that this document expressly waived immunity only for purposes of Fort Peck Energy Company operations.  Tribes are entitled to waive immunity with limitation because waiving sovereign immunity is voluntary. *See Oglala Sioux Tribe v. C&W Enters.*, 542 F.3d 224, 231 (8th Cir. 2008).  Due to the strong presumption against a waiver of tribal sovereign immunity, "[a]ny waiver of immunity . . . 'cannot be implied but must be unequivocally expressed.'"  *Bradley*, ¶ 17 (citations omitted).  The Fort Peck Energy Company Operating Agreement clearly limits the application of immunity waivers to the members of the Fort Peck Energy Company Operating Agreement in Section 10.14.  The Fort Peck documents nonetheless offer an additional example of the Tribes treating A&S as a separate entity that they anticipated could be sued in state courts.

¶39    More on point to this case, when reactivating A&S years later the Tribes passed a Resolution for the purpose of administering the Anadarko leases. The October 12, 2020 Resolution provided:

> **WHEREAS**, upon the recommendation of legal counsel, the Tribes intend to accept the assignment of [Anadarko's] Lustre Field assets and assume its Lustre Field obligations and liabilities through a wholly-owned limited liability company, A&S Mineral Development Company, LLC . . . in existence and in good standing under the laws of Delaware, *to insulate the Tribes from any direct liability with respect to this transaction* other than any

19

capital that the Tribes may contribute to A&S Mineral to complete this acquisition and support its operations[.]

(Italics added.) The Tribes followed with another Resolution that provided, "the Assiniboine and Sioux Tribes has agreed to separate all Tribal mineral development operations from the Tribal government operations and *transfer all such operations to the A&S Mineral Development Co., LLC to operate mineral development activities separate and distinct from the Tribes . . . .*" (Emphasis added.) These Resolutions, pertaining directly to the leases that are the subject of this litigation, demonstrate that the Tribes intended A&S to exist "separate" from the Tribes and "distinct" from the Tribes' immunity from legal liabilities.

¶40    In sum, each time the Tribes had occasion to document the functions and purposes of A&S—including the documents governing the company's management of the Anadarko leases—they expressed a clear separation between the Tribal government, which retained sovereign immunity, and the separate business entity, which the documents anticipate may be subject to claims against its assets. These documents are the clearest indication of the Tribes' intent and demonstrate why sovereign immunity is not determined by a simple tally of factors.

¶41    Just as we do not accept a dispositive rule associated with any single fact, we decline to adopt an analysis that otherwise fails to consider all the circumstances of an entity's relationship with its parent tribe and the nature of the claims at issue. An assessment of sovereign immunity must consider whether, under the circumstances of the case and the relationship between the entity and its parent tribe, some considerations should be given

20

more weight. In this case, the Tribes' choice to incorporate A&S under Delaware law—thereby subjecting it to state laws allowing limited liability companies to sue and be sued[2]—coupled with the Tribes' stated intent to keep A&S a separate and distinct entity for liability purposes, including for the management of the leases at issue, convinces us on de novo review that the District Court erred in its legal conclusions when it weighed and balanced the factors and determined that A&S is immune from suit in this case as an arm of the Tribe.

¶42    Finally, Lustre Oil argues that Section 10.9 of the A&S Operating Agreement and Section 10.16 of the Fort Peck Energy Company Operating Agreement unambiguously waive A&S's sovereign immunity in this case. Tribes are presumptively immune from suit unless Congress authorizes suit or the tribes waive sovereign immunity. *Kiowa Tribes of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 754, 118 S. Ct. 1700, 1703 (1998) (citations omitted). A tribal entity does not enjoy the same presumptive immunity from suit unless the entity is determined to be an arm of the tribe. *Williams*, 929 F.3d at 177. Our conclusion that A&S is not an arm of the Tribes for purposes of Lustre Oil's claims renders an express waiver analysis unnecessary because the Tribes did not extend immunity in the first place. *See Williams*, 929 F.3d at 177 (an entity must demonstrate that it is an arm of the tribe entitled to immunity before the burden shifts to the party arguing against sovereign immunity to demonstrate that immunity was abrogated by Congress or waived by the tribe).

---

[2] *See* 6 Del. C. §§ 18-215(b)(1), 18-218(c)(1).

¶43   We conclude that consideration of all the circumstances encompassed within the *White* factors weighs against the extension of sovereign immunity to A&S as an arm of the Tribes for the purpose of Lustre Oil's claims in this case.

**CONCLUSION**

¶44   A&S is not entitled to sovereign immunity from Lustre Oil's claims in this case. The District Court erred in concluding otherwise. We reverse and remand the case for further proceedings.


/S/ BETH BAKER


We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE


Justice Jim Rice, concurring.

¶45   I concur with the Court, but the opinion well illustrates the deficits in current law regarding determination of tribal corporation immunity, and the need for clearer standards or bright-line rules. "[C]ommercial activity of tribes has proliferated," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 823, 134 S. Ct. 2024, 2051, 188 L. Ed. 2d 1071, 1105 (2014) (Thomas, Ginsburg, Scalia, Alito, JJ, dissenting), including the creation of tribal corporations, but the law has not caught up. We are left with nebulous factors to "consider," Opinion, ¶ 22, when deciding if a tribal corporation is "sufficiently related to tribal self-governance" to warrant extension of the tribe's immunity to the corporation.

Opinion, ¶ 32 (citation omitted). In pursuit of this sufficient-relation determination, we conclude here that incorporation of the tribal business entity under state law "does not favor" immunity, but nonetheless also conclude this fact should not "hold such a heavy emphasis without also considering the entire circumstances" of the entity's method and creation "as related to its parent tribe." Opinion, ¶¶ 30, 31. However, when undertaking consideration of these "entire circumstances . . . as related to [the] parent tribe," we may not "probe [too] deeply into a tribe's governmental affairs," because this inquiry itself may "infringe too greatly on tribal self-governance and self-determination." Opinion, ¶¶ 31, 34 (citation omitted). Thus, there are countervailing considerations for application of individual factors, and differing weights to be assigned to each factor. Viewed in combination with the elusive sixth factor, which mandates the overall analysis be guided by "the policies underlying tribal sovereign immunity," *Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010), courts are left with a malleable muddle with little guidance on how to even assess the factors, let alone apply them. Indeed, our determination in this case to reverse orbits around the tribal intent factor, about which we conclude that, while the District Court correctly weighed the factor against extension of tribal immunity, it nonetheless erred by not weighing this factor *enough* against tribal immunity. Opinion, ¶ 41.

¶46 The *White* multi-factor balancing test, first utilized by the Ninth Circuit in 2014, is already a demonstrably ineffective mechanism for dealing with this issue. The determination of immunity for tribal corporations engaged in the streams of commerce, highlighted by the recent phenomenal growth in tribal commercial activities, should not be

23

left to such shifting sands. "Tribal immunity significantly limits, and often extinguishes, the States' ability to protect their citizens and enforce the law against tribal businesses. . . . The problem repeats itself every time a tribe fails to pay state taxes, harms a tort victim, breaches a contract, or otherwise violates state laws, and tribal immunity bars the only feasible legal remedy." *Bay Mills*, 572 U.S. at 823-24 (Thomas, Ginsburg, Scalia, Alito, JJ, dissenting). States and tribes must be able to operate with clarity when tribal agents engage in off-reservation commercial enterprises. The *Somerlott* rule could be a start, but it addresses a limited circumstance, and its current validity is unclear. The vagueness in the law promotes lengthy litigation in every case, and leaves the law, and thus the courts, with insufficient direction. A better test must be adopted, or Congress must act to provide clear guidance.

/S/ JIM RICE

Justice Laurie McKinnon, specially concurring.

¶47    I would conclude, under the five factors in *White v. University of California*, 765 F.3d 1010 (9th Cir. 2014), and A&S's clear connection to tribal economic development and self-determination, that A&S is an enterprise of the Tribes but that the Tribes have waived A&S's immunity. Indeed, A&S is an archetypal tribal entity: it was created by the Tribes' government and rooted in its constitution; its purpose is solely to benefit the Tribes through economic development of its natural resources; it is completely owned and managed by the Tribes, and all revenues A&S earns are paid into the Tribes' general fund for the benefit of its people and tribal programs. Notwithstanding the Tribes' creation of

24

A&S as a tribal enterprise, the Tribes expressly declined to extend their immunity to A&S, likely "to ensure that A&S is able to conduct business on a regular basis."[1] Our wholesale conclusion that A&S is not a tribal entity misconstrues the law. The first crucial question is whether A&S functions as an enterprise of the Tribes. It clearly does. The second crucial question is whether the Tribes have waived A&S's sovereign immunity. It clearly has. I would conclude that A&S is an enterprise of the Tribes but that the Tribes have expressly waived A&S's sovereign immunity. I therefore concur in the judgment reached by the Court, but strongly disagree with the Court's analysis.

¶48    Our de novo standard of review requires that we review for clearly erroneous facts and incorrect conclusions of law. Here, the Court does not conclude the District Court made erroneous factual determinations or that it failed to make required findings. Instead, the Court concludes the District Court made incorrect conclusions of law when it did not give sufficient weight to one of the five *White* factors. The Court makes the *same* conclusions of law as the District Court. However, the Court holds the District Court erred in the *weight* it gave to the intent factor in the balancing. Here, the District Court held that the language contained in the A&S Operating Agreement weighed against immunity; but the Court holds that same language completely defeats immunity, even when balanced with the other factors. This is essentially a de facto conclusion, *not* a balancing and consideration of all the *White* factors, and it *is* also a misapplied waiver analysis. By "blending" two distinct analyses of waiver and "arm of the tribe," the Court throws the

---

[1] Tribes' Resolution #2276-2009-10.

baby (creation of a tribal entity to further tribal interests) out with the bathwater (an express waiver of A&S's immunity). The Court also misconstrues the "method of creation" factor by finding that the Tribes' decision to incorporate under Delaware law weighed against finding immunity. I will address this error as well.

¶49 To begin, Lustre Oil has asked this Court to apply *Somerlott v. Cherokee Nation Distributors Inc*., 686 F.3d 1144 (10th Cir. 2012), to conclude that A&S does not have immunity. *Somerlott* is the progeny of several cases out of the Tenth Circuit which are not discussed by the Court. Therefore, before addressing the propriety of adopting *Somerlott*, some jurisprudential background information is in order. I am also concerned the Court has relied upon many cases in its analysis which are distinguishable from the circumstances here and do not provide the support the Court claims they do. In *White*, for example, the Ninth Circuit considered whether the Kumeyaay Cultural Repatriation Committee, a tribal organization which was formed in 1997 by tribal resolutions from each of its twelve Kumeyaay Nation member tribes, was an "arm of the tribe" entitling it to the tribe's sovereign immunity status in litigation under the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. § 3001. Applying the Tenth Circuit's factors from *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010), the Ninth Circuit concluded that the Repatriation Committee was an "arm of the tribe." Importantly, and absent from the Court's discussion here, the Repatriation Committee in *White* was *not* created under state law but was created by the tribes under tribal law. *White*, 765 F.3d at 1025. Its purpose was to organize tribal leaders and members to address repatriation efforts under NAGPRA. The Ninth Circuit considered

26

whether NAGPRA's enforcement clause conferring jurisdiction to the federal courts over an action alleging a violation of NAGPRA abrogated tribal sovereign immunity. Noting that when Congress intends to abrogate a tribe's sovereign immunity it must do so unequivocally, the court concluded that the Act did not contain an "unequivocal expression" of abrogation. *White*, 765 F.3d at 1024; *see Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788, 134 S. Ct. 2024, 2031 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S. Ct. 1670, 1677 (1978)). Thus, *White* dealt with an Act of Congress which clearly affected the tribes and their ancestry. No aspect of *White* involved a tribal entity incorporated under state law for purposes of enhancing economic development. Nor does *White* speak to a significant aspect in this case; and that is that the Tribes specifically and expressly declined to extend its immunity to the tribal entity it created.

¶50    The Court fails to adequately discuss and distinguish *Breakthrough*. *Breakthrough* similarly did not involve an entity created under state law. *Breakthrough* is the second of three cases issuing from the Tenth Circuit over a four year period which involved a tribal entity and whether it was an "arm of the tribe." The first case, *Native American Distributing v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288 (10th Cir. 2008), is particularly relevant to the facts here because of the inclusion in the entity's corporate charter that it had the power "[t]o sue and be sued; to complain and defend in any court." *Native Am. Distrib.*, 546 F.3d at 1290. Lustre Oil argues that Delaware statutes provide that a Delaware created limited liability company "shall be a separate legal entity" subject to suit. In *Native American Distributing*, the Seneca-Cayuga Tribe of Oklahoma, a federally recognized Indian tribe, exercised its power under Section 3 of the Oklahoma

27

Indian Welfare Act of 1936, 25 U.S.C. § 503, to organize by creating a constitution and a corporate charter, although only required to organize under one entity. *Native Am. Distrib.*, 546 F.3d at 1290. The tribe, under its constitution, created a "Business Committee" with the power to transact business and otherwise speak on behalf of the tribe. In contrast to the tribe's constitution, the tribe's corporate charter contained a clause granting the corporate entity the power to sue and be sued in any court. The Business Committee, exercising its authority under the tribal constitution, adopted a resolution creating a tribal enterprise for the manufacture and sale of tobacco and declared "such Tribal enterprise and its activities as essential government functions of the Seneca-Cayuga Tribe." *Native Am. Distrib.*, 546 F.3d at 1291. The question before the Tenth Circuit was whether the entity created by the Business Committee, the Seneca-Cayuga Tobacco Company (SCTC), functioned as an enterprise of the Tribe, which would extend sovereign immunity to SCTC, or whether it functioned as an enterprise of the Tribal Corporation, which had expressly and unequivocally waived its immunity through the "sue or be sued" clause contained within its corporate charter.[2] *Native Am. Distrib.*, 546 F.3d at 1293.

¶51     First, the court rejected plaintiffs' arguments that the *scope* of the tribal immunity doctrine should be limited to *exclude commercial activities*. The court explained that

---

[2] The court noted the defendants had conceded the "sue or be sued" clause constituted an unequivocal waiver of immunity, but the court also observed that whether such a clause contained in a corporate charter functions as an unequivocal waiver has been questioned. *Native Am. Distrib.*, 546 F.3d at 1293 n.2. "Most courts have reasoned that tribal adoption of a charter with such a clause simply creates the power in the corporation to waive immunity, and that adoption of the charter alone does not independently waive tribal immunity." Felix S. Cohen's Handbook of Federal Indian Law § 7.05(1)(c) (2005 ed.).

28

"[w]hile the Supreme Court has expressed misgivings about recognizing tribal immunity in the commercial context, the Court has also held that the doctrine is 'settled law' and that it is not the judiciary's place to restrict its application." *Native Am. Distrib.*, 546 F.3d at 1294 (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756-59, 118 S. Ct. 1700, 1703-06, (1998)). The court observed that the Supreme Court has indeed acknowledged "tribes could use their immunity as a sword rather than a shield." *Kiowa Tribe*, 523 U.S. at 756. However, the court reasoned that "[d]espite these concerns with the assertion of immunity, the [Supreme] Court has held fast to its position that such concerns are not the province of the courts, but of Congress or of the tribe itself." *Native Am. Distrib.*, 546 F.3d at 1294. *See Ute Distrib. Corp. v. Ute Indian Tribe*, 149 F.3d 1260, 1267 (10th Cir. 1998) (holding that there can be no "waiver of tribal immunity based on policy concerns, perceived inequities arising from the assertion of immunity, or the unique context of a case"); *Pan Am. Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416, 419 (9th Cir. 1989) ("Indian sovereignty, like that of other sovereigns, is not a discretionary principle subject to the vagaries of the commercial bargaining process or the equities of a given situation.").

¶52 Recognizing that limiting the scope of the doctrine to exclude commercial activities should be left to Congress, the court in *Native American Distributing* declined to limit the doctrine by excluding commercial activities and proceeded to address the facts, concluding SCTC functioned as an "arm of the tribe." The court acknowledged the well-recognized principle that a tribe's immunity from suit under the doctrine may be overcome in only one of two ways: first, Congress has the power to abrogate the tribe's immunity; and second,

29

the tribe can waive its own immunity. *Native Am. Distrib.*, 546 F.3d at 1293. In either event, "a waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Ute Distrib.*, 149 F.3d at 1263 (quoting *Santa Clara Pueblo*, 436 U.S. at 58). The court concluded that "[w]hile the Business Committee could have invoked its powers under the Corporate Charter to justify creation of a tobacco company, it instead invoked its constitutional powers to do so." *Native Am. Distrib.*, 546 F.3d at 1294. Moreover, the court noted the resolution creating the tobacco company expressly declared that its activities are "essential government functions of the Seneca-Cayuga Tribe" and, further, that there was no reason for the Business Committee to have used this language unless it intended "to make clear that the tobacco company was a division of the Tribe . . . ." *Native Am. Distrib.*, 546 F.3d at 1294. Finally, the court reasoned that the same resolution which approved an agreement with another entity for management of the tobacco company expressly provided that the Business Committee *did* waive immunity to the management company, but *only* as to the management company. Thus, by including an express waiver of immunity in the resolution, one limited to the management company, the court held the Business Committee clearly expressed its belief that SCTC was a division of the tribe that was entitled to immunity, and that for this immunity to be waived, it would need to affirmatively express an intention to do so. *Native Am. Distrib.*, 546 F.3d at 1294. The court next explained that SCTC was not created under the tribe's corporate charter and therefore was not bound by the "sue or be sued" clause; rather SCTC was created under the tribe's constitution which had not waived the tribe's sovereign immunity. *Native Am. Distrib.*, 546 F.3d at 1294.

30

¶53     Two years later, in *Breakthrough*, the Tenth Circuit again revisited the relationship between an Indian tribe and the economic entity created by the tribe to assess how close that relationship must be for those entities to share in the tribe's sovereign immunity. *Breakthrough*, 629 F.3d at 1176.  Breakthrough provided management services for the Chukchansi Tribe's casino, which was owned and operated by the Chukchansi Economic Development Authority.  Both entities were unincorporated and created by the tribe for the sole purpose of promoting tribal interests through the ownership and operation of an Indian gaming facility.  The court recognized that Congress had sought to promote tribal sovereignty and self-sufficiency through economic development and, particularly relevant to the Chukchansi Tribe, provided a statutory authorization for Indian gaming, 25 U.S.C. § 2702(1).  *See Cal. v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218-219, 107 S. Ct. 1083, 1093 (1987) ("The Cabazon and Morongo Reservations contain no natural resources which can be exploited.  The tribal games at present provide the sole source of revenues for the operation of the tribal governments and the provision of tribal services.  They are also the major sources of employment on the reservations.  Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members").  Further, it was undisputed in *Breakthrough* that tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, "provided that the relationship between the tribe and the entity is sufficiently close to properly permit the entity to share in the tribe's immunity." *Breakthrough*, 629 F.3d at 1183.  Thus, the court framed the question: "Does the resulting entity have a distinct, nongovernmental character and therefore is not immune, or is it

31

merely an administrative convenience, and therefore immune?" *Breakthrough*, 629 F.3d at 1184.

¶54     The primary issue in *Breakthrough* was the trial court's application of the *Johnson*[3] test to measure the closeness of the relationship between the tribe and the Chukchansi Economic Development Authority and casino. The *Johnson* test required application of ten factors; however, the tenth factor was considered a threshold determination for the remaining nine factors. The tenth factor considered the financial relationship between the entity and the tribe and whether a judgment against the entity would affect tribal assets, just as the Supreme Court of Alaska had done in *Runyon v. Association of Village Council Presidents*, 84 P.3d 437 (Alaska 2004). The court, returning to its decision in *Native American Distributing*, explained that the most important lesson learned from that decision was that "[the court] did not examine the financial relationship between SCTC and the tribe and whether a judgment against SCTC would reach the tribe's monetary assets, much less designate that factor as a threshold determination." *Breakthrough*, 629 F.3d at 1187. The court reaffirmed that its decision in *Native American Distributing* "depended upon whether SCTC was a division of the tribal corporation, which had waived its immunity from suit, or of the tribe, which had waived its immunity only as to actions of the tribal corporation." *Breakthrough*, 629 F.3d at 1186.

---

[3] *Johnson* was an unpublished opinion from the United States District Court for the District of Kansas. *Johnson v. Harrah's Kansas Corp.*, No. 04-4142-JAR, 2006 U.S. Dist. LEXIS 7299, 2006 WL 463138 (D. Kan. Feb. 23, 2006).

¶55 After rejecting the *Johnson* test, the court adopted a six factor test, which has been set forth in the majority opinion. The court next applied the six factor test to the Chukchansi tribal entities. The court explained, under the first factor, that the entities were created under tribal law and described by resolution as an "instrumentality" and "authorized agency" of the tribe. *Breakthrough*, 629 F.3d at 1192-93. The entities were characterized in their founding documents as "a wholly owned . . . enterprise of the Tribe" which, the court concluded, naturally suggested that they enjoyed a close relationship to the tribe. *Breakthrough*, 629 F.3d at 1192. The purpose for creating the entities, the second factor, was to "further the economic prosperity" of the tribe through allocation of casino revenue for the tribe's benefit. *Breakthrough*, 629 F.3d at 1192. The structure, ownership, and management of the entities—the third factor—favored immunity because the entities were primarily run by members of the tribe. Regarding the fourth factor of intent, the court concluded the tribe clearly intended to extend tribal sovereign immunity to the entities because the ordinances themselves "clothed" them with the same privileges and immunities as the tribe and clearly expressed the tribe's belief that the entities were a division of the tribe entitled to immunity. *Breakthrough*, 629 F.3d at 1193-94. The financial relationship between the tribe and the entities demonstrated the entities were close to the tribe because the tribe depended heavily on the casino for revenue to fund its governmental operations, support its tribal members, and search for other economic development opportunities. And, finally, the sixth factor—the overall purpose of tribal sovereign immunity—was served by extending immunity to the entities because Congress had expressed a strong policy in favor of encouraging tribal economic development and extending immunity "directly protects

33

the sovereign Tribe's treasury, which is one of the historic purposes of sovereign immunity in general." *Breakthrough*, 629 F.3d at 1183 (quoting *Allen v. Gold Country Casino*, 464 F.3d 1044, 1047 (9th Cir. 2006)). The court noted that, in comparison, "[c]ases which have not extended immunity to tribal enterprises typically have involved enterprises formed solely for business purposes and without any declared objective of promoting the [tribe's] general tribal and economic development." *Breakthrough*, 629 F.3d at 1195 (internal quotations omitted) (quoting *Trudgeon v. Fantasy Springs Casino*, 71 Cal. App. 4th 632, 640, 84 Cal. Rptr. 2d 65, 70 (1999)). The court concluded that the entities were so closely related to the tribe that they should share in the tribe's sovereign immunity. *Breakthrough*, 629 F.3d at 1195.

¶56    It is important to examine the court's analysis and reasoning in *Native American Distributing* and *Breakthrough*, as I have done, to place in context the Tenth Circuit's third decision—*Somerlott*—and the propriety of adopting its reasoning. Lustre Oil asks this Court to adopt the *Somerlott* decision and hold that A&S, because the Tribes incorporated the company in Delaware, is not entitled to the Tribes' immunity. *Native American Distributing* and *Breakthrough* provide the groundwork for addressing whether a tribal entity is entitled to a tribe's immunity. Although the Court rejects applying *Somerlott*, it is upon reasoning I do not find persuasive.

¶57    In *Somerlott*, the Tenth Circuit held that an entity is legally distinct from its members and tribe when it "voluntarily subject[s] themselves to the authority of another sovereign which allows them to be sued." *Somerlott*, 686 F.3d at 1149-50. Accordingly, "a separate legal entity organized under the laws of another sovereign . . . cannot share in

34

the [tribe's] immunity from suit, and it is not necessary to apply the six-factor [*Breakthrough*] test." *Somerlott*, 686 F.3d at 1150. The concurring opinion buttressed the reasoning of the court:

> [Tribal sovereign immunity] is not limited by the type of activity involved or where it takes place. But no matter how broadly conceived, sovereign immunity has never extended to a for-profit business owned by one sovereign but formed under the laws of the incorporating second sovereign when the laws of the incorporating second sovereign expressly allow the business to be sued. And it doesn't matter whether the sovereign owning the business is the federal government, a foreign sovereign, state—or tribe.

*Somerlott*, 686 F.3d at 1156.

¶58　The concurrence reasoned that as a legally distinct entity being created, embodied, and brought into existence by the law of a second sovereign, a corporation is defined by and subject to the privileges and responsibilities provided by that sovereign's laws. *Somerlott*, 686 F.3d at 1156. A corporation is not a natural person, but "an artificial being that may exercise only those privileges the law confers upon it, either expressly, or as incidental to its very existence." *Somerlott*, 686 F.3d at 1156 (internal quotations omitted). Thus, the concurrence reasoned, the entity's claim to immunity is inconsistent with this foundational principle of corporate law and the state law under which it became incorporated becomes part of its charter. When a tribe chooses to create an entity under state law, it does so according to the terms another sovereign has prescribed and it has no authority to "commandeer that State's legislative processes and rewrite the statutory terms and condition of its formation . . .," any more than a state may rewrite the laws of a tribe. *Somerlott*, 686 F.3d at 1156. To allow the entity "to revise Oklahoma's statutory code to suit its preferences, would, clearly viewed, represent an infringement on the rights of only

35

one sovereign—Oklahoma." *Somerlott*, 686 F.3d at 1156. Finally, the *Somerlott* concurrence reasoned that the *Breakthrough* six factor test "does not alter the analysis" because the test *only* exists to determine whether a particular tribal entity is or is not "a legal entity separate and distinct from the tribe; when incorporated under state law, the laws of the second sovereign say that it is." *Somerlott*, 686 F.3d at 1156.

¶59 It is well-established that a tribe's immunity from suit may only be overcome in one of two ways. First, Congress has the power to abrogate the tribe's immunity. *Santa Clara Pueblo*, 436 U.S. at 58. Second, the tribe can waive its own immunity. *E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1304 (10th Cir. 2001). In either event, "a waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58. Accordingly, *Somerlott*'s conclusion that a tribal entity waives sovereign immunity by incorporating under the laws of another sovereign informs a waiver analysis and is thus distinguishable from an impermissible judicial narrowing or expansion of the sovereign immunity doctrine itself.[4] This is evident because the Tenth Circuit had previously recognized the role of Congress in altering the scope of the doctrine, and declared it was not the role of the judiciary. In my opinion, very simply, *Somerlott* incorrectly holds that utilizing a second sovereign's laws as a vehicle for incorporation automatically and unequivocally constitutes a waiver. *Somerlott*'s reasoning suggests that based on the place of an entity's incorporation it can no longer avail itself of

[4] Examples of when Congress acts to limit the scope of tribal immunity include the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(7)(ii); the Clean Water Act, 33 U.S.C. § 1365; the Safe Drinking Water Act, 42 U.S.C. § 300j-9(i)(1)(c); the Resources Conservation and Recovery Act, 42 U.S.C. § 6972; and the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101-5125.

certain laws. However, when a corporation agrees to "sue or be sued" under another sovereign's laws it does not forego the application of that jurisdiction's substantive laws. A tribal entity incorporated under state law may still claim the benefit of that state's laws and the federal law, which include principles of sovereign immunity. *See Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe*, 498 U.S. 505, 509-10, 111 S. Ct. 905, 909-10 (1991) (the fact that a tribe as a plaintiff was subjected to a compulsory counterclaim under Federal Rule of Civil Procedure 13(a) was insufficient to waive sovereign immunity).

¶60 The Tenth Circuit's own precedent does not support a rule of automatic waiver when a sovereign avails itself of another sovereign's laws. In *E.F.W.*, plaintiffs argued that tribal defendants waived their immunity by entering into an agreement with the State of Wyoming for social services, arguing that these defendants became state actors because the agreement incorporates state law, provides for state training, and allows the state to inspect and review the tribes' case records. Plaintiffs also argued that when E.F.W. was removed from her home, the only authority supporting such action was state law. Plaintiffs did not argue that Congress had abrogated the tribes' immunity, only that the agreement and the requirement to follow state law constituted a waiver by the tribes.

¶61 The Tenth Circuit disagreed. It concluded the agreement contained no language that could be construed as an unequivocal waiver by the tribes. *E.F.W.*, 264 F.3d at 1304. The court reasoned the State of Wyoming, Shoshone and Arapaho Tribal Social Services, and the tribes themselves did "not waive sovereign immunity by entering [into] the [agreement], and specifically retain[ed] immunity and all defenses available to them as

37

sovereigns pursuant to Wyo. Stat. Sec. 1-39-104(a) and all other applicable Tribal, Federal or State law." *E.F.W.*, 264 F.3d at 1304. The fact that the tribe "agreed to act in accordance with state law to some degree and in essence to adopt state law [was] simply not an express waiver of their tribal sovereignty with respect to actions taken under that law." *E.F.W.*, 264 F.3d at 1304. The court noted the Supreme Court has held that "[t]o say substantive laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit . . . . There is a difference between the right to demand compliance with state laws and the means available to enforce them." *Kiowa Tribe*, 523 U.S. at 751.

¶62 Consistent with these principles, courts throughout the country have repeatedly held a tribe's agreement to comply with a particular law does not amount to an unequivocal waiver of a tribe's immunity. *See, e.g.*, *Nanomantube v. Kickapoo Tribe in Kan.*, 631 F.3d 1150, 1153 (10th Cir. 2011) (holding a tribe's agreement to comply with Title VII of the Civil Rights Act of 1964 did not constitute "an unequivocal waiver of tribal sovereign immunity"); *Wis. v. Timber & Wood Products*, 379 Wis. 2d 690 (Wis. 2017) (claim against a tribe to recover taxes alleging that it waived its sovereign immunity by agreeing to comply with the Forest Croplands Law was dismissed because, while the statute made it liable for payment of severance tax, it did not state that the tribe consented to be sued in order to enforce any lien or personal liability); *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1289 (11th Cir. 2001) (a tribe's contractual promise to comply with an anti-discrimination provision of the Rehabilitation Act "merely convey[ed] a promise not to discriminate" and "in no way constituted an express and unequivocal waiver of sovereign immunity"); *Cohen v. Little Six, Inc.*, 543 N.W.2d 376, 380 (Minn. Ct. App.

1996) (a tribal corporation did not waive its sovereign immunity by registering as a foreign corporation and thereby agreeing to be "subject to the laws of [Minnesota]"); *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 2013 OK 77, ¶ 42, 315 P.3d 359, 371 (Okla. 2013) (holding a tribe did not waive its sovereign immunity by applying for and accepting a liquor license—which required the tribe to agree not to violate federal, state, or municipal law—because by doing so the tribe merely promised to comply with those laws, not subject itself to lawsuits).

¶63 Based on the foregoing, I would reject *Somerlott*'s reasoning and conclusion that a tribal entity incorporating in another state automatically and unequivocally waives its sovereign immunity. Whether an entity is a tribal entity depends on the context in which the question is addressed. *Dille v. Council of Energy Res. Tribes*, 801 F.2d 373, 376 (10th Cir. 1986) (stating that "the definition of an Indian tribe changes depending upon the purpose of the regulation or statutory provision under consideration"). In my opinion, the *Somerlott* analysis presumes an unequivocal waiver in every instance and context, contrary to well established precedent. I do not find persuasive, as the Court does, the logic of *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S. Ct. 961 (1995), which did not involve a tribe and addressed whether Amtrack was an instrumentality of the federal government for First Amendment purposes, or the federal district court cases—*Manzano v. S. Indian Health Council, Inc.*, No. 20-cv-02130-BAS-BGS, 2021 U.S. Dist. LEXIS 126475 (S.D. Cal. July 7, 2021), *J.L. Ward Assocs. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163 (D. S. D. 2012), and *Giedosh v. Little Wound Sch. Bd., Inc.*, 995 F. Supp. 1052 (D. S. D. 1997). In *J.L. Ward* and *Manzano*, for example, the

primary issue before the court was the formation of an entity which brought together numerous tribes from different states, picking one state within which to incorporate. Instead, any discussion of the propriety of adopting *Somerlott* must be informed by a waiver analysis: whether there has been an express and unequivocal waiver by the tribe itself. Tribes do not waive their immunity by agreeing to act in accordance with or adopting state law. I thus disagree with the Court when it concludes that A&S's incorporation under Delaware law "weighs" against immunity on the first *Breakthrough* factor—method of creation. The cases upon which the Court relies either stand for the *Somerlott* proposition that there is an automatic unequivocal waiver upon state incorporation or do not otherwise associate state incorporation under the "method of creation" factor. Opinion, ¶ 30. In my opinion, the factor examining how an entity was created demands a more meaningful and substantive examination than just an observation that the incorporation occurred under state law.

¶64    Here, in contrast to the Court's sole reliance on A&S's incorporation under Delaware law, I would consider circumstances normally addressed by courts and conclude that A&S's method of creation *supports* that it is a tribal entity. In 2009, the Tribes elected a governing Executive Board, pursuant to its constitutional authority to "engage in any business that will further the economic well-being of the members of the Tribes" and to "undertake any programs and projects designed for the economic advancement of the people . . .," and enacted Resolution 1514-2009-03 which directed that A&S be created to proceed with the development of the Tribes' natural resources. The Resolution provided it was the "Tribes' top priority to secure business relationships with credible oil and gas

companies that are willing to enter into business relationships that would be in the best interest of, and of benefit to members of the Tribes." The Resolution provided that the "Tribes will participate [in this development] via a limited liability corporation the Tribes will form, to be called A&S Mineral Development Company, LLC." Thus, A&S was created as an instrumentality and agency of the Tribes and was wholly owned and managed by the Tribes. I would conclude that although A&S was incorporated under state law, that it nonetheless was created by the Tribes pursuant to its constitutional authority and by resolution through its governing body. A&S's creation clearly was a result of the Tribes' exercise of self-governance for the benefit of tribal members. In my opinion, the Court is wrong to conclude the vehicle of incorporation is a more important consideration than the founding documents and authority for A&S's creation; that is, the Tribes' constitutional authority and governing body's resolutions. The method of creation favors a conclusion that A&S is a tribal enterprise.

¶65    Although I would conclude that the Tribes expressly waived A&S's immunity, it is my opinion that the District Court properly weighed and considered the remaining *White* factors. The purpose for creating A&S was to further economic prosperity of the Tribes through development of its oil and gas resources. The A&S Operating Agreement also provided that its purpose was for the Tribes to have control over oil and gas development to avoid further environmental degradation. A&S was wholly owned by the Tribes and the Tribal Executive Board retained authority over A&S through its appointment of all A&S officers, A&S's manager, and its ability to override any decision and assume complete control over A&S's operations at any time. Finally, all A&S's profits are distributed

41

directly to the Tribes on a quarterly basis and deposited into the Tribes' general fund. The record shows A&S's revenue is substantial: over one quarter (between October 2020 and January 2021) A&S provided $184,805 to the Tribes. This revenue significantly protects the Tribes' treasury and promotes self-determination and self-sufficiency of the Tribes. A&S is the archetypal tribal entity created and managed by the Tribes for the benefit of the Tribes' members. It is distinctly governmental in character and functions as an instrumentality of the Tribes. Based on the foregoing, I would conclude that A&S functions as a tribal enterprise and, but for the express waiver, would be entitled to the Tribes' immunity.

¶66 Unlike the tribe itself, an entity is not given "a presumption of immunity until it has demonstrated that it is in fact an extension of the tribe." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177 (4th Cir. 2019). Once a defendant has demonstrated they are a tribal entity, "the burden to prove the immunity has been abrogated or waived would then fall to the plaintiff." *Williams*, 929 F.3d at 177. A&S, based on my foregoing analysis, has demonstrated they function as a tribal enterprise. Accordingly, the burden shifts to Lustre Oil to demonstrate A&S's immunity has been waived. I would conclude that Lustre Oil has met that burden.

¶67 In 2009, the Tribes established the A&S Operating Agreement (Agreement). Article 1.5 of the Agreement provides A&S "shall continue indefinitely or until earlier terminated in accordance with Article 8 [Winding Up]." Thus, at the time these proceedings were initiated and during the development of the facts underlying these proceedings, A&S was a functional, viable—albeit inactive—corporation in good standing and governed by the

42

2009 Agreement. The terms of the Agreement are thus indicative of whether the Tribes intended to extend its immunity to A&S. It expressly declared that they did not.

¶68 Article 10.9 expressly waives A&S's immunity. It is the only section within the whole Agreement which is entirely capitalized. It provides:

> SOVEREIGN IMMUNITY OF THE TRIBES. ANY AGREEMENTS, OBLIGATIONS, AND TRANSACTIONS ENTERED INTO BY THE COMPANY SHALL BE SOLELY FOR ITS ACCOUNT AND ONLY ITS ASSETS SHALL BE SUBJECT TO ANY CLAIM RELATED THERETO. IN NO EVENT SHALL THE TRIBES HAVE ANY OBLIGATION OR BE SUBJECT TO ANY CLAIM WITH RESPECT TO ANY AGREEMENT OR TRANSACTION INTO WHICH THE COMPANY MAY ENTER OR ENGAGE. NOTHING HEREIN CONTAINED SHALL BE CONSTRUED AS A WAIVER OR LIMITATION OF THE SOVEREIGN IMMUNITY POSSESSED AND ENJOYED BY THE TRIBES AS FEDERALLY RECOGNIZED INDIAN TRIBES, OR BY THEIR OFFICERS, THE MEMBERS OF THEIR EXECUTIVE BOARD, THEIR EMPLOYEES AND AGENTS.

¶69 This is an express and unequivocal waiver from the Tribes that A&S was not to share in their sovereign immunity. As in *Native American Distributing*, sovereign immunity here was exclusively limited to the Tribes. The Agreement further provided in Article 6.2:

> No Member shall be liable for the debts, obligations, or liabilities of the Company, including under a judgment decree or order of a court. No agreement or commitment entered into by the Company shall bind or be enforceable against the Member or the Member's Assets. All such debts, obligations, liabilities, agreements, or commitments shall be solely obligations of the Company, enforceable and collectable only against and from the Company's assets.

¶70 In addition to these provisions of the Agreement, which in my opinion constitute express and unequivocal waivers from the Tribes that A&S would not enjoy their immunity, the Tribes also issued two resolutions in 2020 regarding the leases at issue here.

43

The first tribal resolution issued October 12, 2020, provided A&S was "in existence and in good standing" and would "insulate the Tribes from any direct liability with respect to this transaction other than any capital that the Tribes may contribute to A&S Mineral to complete this acquisition and support its operation . . . ." In a second resolution issued October 23, 2020, the Tribes provided: "Whereas, the Assiniboine and Sioux Tribes has agreed to separate all Tribal mineral development operations from Tribal government operations and transfer all such operations to the A&S Mineral Development Co. LLC to operate mineral developments separate and distinct from the Tribes . . . ." While these resolutions themselves do not mention sovereign immunity as the Agreement did, they support that A&S was not to have the Tribes' sovereign immunity.

¶71    Based on the foregoing analysis, I would conclude that the A&S Operating Agreement the Tribes entered when forming A&S constituted an express and unequivocal waiver of A&S's immunity. I would not find a waiver of immunity based on the Tribes' incorporation of A&S under Delaware law as there is well-established precedent that the Tribes' agreement to act in accordance with state law is not an express waiver of their immunity. While I understand the distinction in *Somerlott* regarding *creation* of an entity under state law versus agreeing to follow state law, it is not a distinction worthy of establishing a rule of automatic waiver, particularly given the requirement in *Kiowa Tribe*, and like precedent, that any waiver must be express and unequivocal. Finally, I disagree that A&S is not a tribal entity. I think the Court's conclusion to the contrary will detrimentally impact a tribe's ability to establish entities that promote development of tribal

resources which will enhance the tribe's self-determination, self-sufficiency, and provide benefits to its members.

¶72 It is pursuant to this analysis that I would resolve this case. I, therefore, specially concur.

/S/ LAURIE McKINNON

Justices Ingrid Gustafson and Dirk Sandefur join in the special concurrence of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR